## Staunton.

## DAVIS V. ALDERSON.

September 17, 1919.

Absent, Kelly, J.

1. SPECIFIC PERFORMANCE—*Defense—Bargain Unprofitable.* — The mere fact that a party has made a bad trade or unprofitable bargain will not relieve him from specific performance.

2. EXPERT AND OPINION EVIDENCE—*Insanity—When Testimony of Physician Opinion and not Expert Evidence.*—In a suit for specific performance where the defense was insanity of the vendee, physicians testified that, having regard to the financial condition of the vendee, if he entered into the transactions in question he had an exaggerated idea as to his own worth; that the transaction was the product of a man's brain who did not realize at the time the responsibility of the obligation he was entering into and must have been the act of a man who was mentally defective or irresponsible; and that something was influencing him outside of the ordinary things brought to bear in trading. None of the physicians was willing to go so far as to say that the vendee was insane.

   *Held:* That their testimony was not expert testimony at all, but the mere inexpert opinions, and should have been excluded, and although it is too late to ask for their exclusion on appeal, yet their opinions are of no aid to the court in arriving at a correct conclusion of the question involved.

3. EXPERT AND OPINION EVIDENCE—*Insanity—Testimony of Lay Witness.*—Testimony of lay witnesses as to the sanity or insanity of a person is admissible in evidence where it appears that the witness has had sufficient opportunity, by observation, to form an opinion worth considering, but the opinion of the witness should be preceded by a statement of his opportunity for observation, and of the facts observed.

4. EXPERT AND OPINION EVIDENCE—*Insanity—Testimony of Lay Witness—Value of Testimony.*—The value of the testimony of lay witnesses as to the sanity or insanity of a person is dependent very largely upon the character of the witness, his opportunities for observation, the facts observed, the interest, bias or

86

prejudice of the witness, his capacity and intelligence in making and relating his observations and other circumstances which affect the weight to be given to oral testimony generally. Usually such testimony, where general and continuous insanity is not involved, is not esteemed of much value, except so far as the opinion of the witness is justified by the data observed.

5. VENDOR AND PURCHASER—*Insanity of Vendee—Case at Bar.*—In the instant case it was conceded that the vendee was competent to contract shortly before the contract in question was entered into, and that members of his family who testified to his insanity did not hesitate to contract with him within five days of that time. The testimony of his family as to his insanity was of the vaguest and most unsatisfactory nature, giving no facts sufficient to support even their unsatisfactory conclusions as to his mental capacity to contract. The three persons present when the contract in suit was entered into testified that he seemed to be in possession of his faculties, and there was other corroborative testimony to this effect. If he had realized his expectations, the transactions relied upon as evidence of his insanity could not have been said to be foolish and his reasoning on the subject could not be said to indicate insanity.

   *Held:* Upon this and other evidence that the vendee's insanity was not established.

6. JUDICIAL NOTICE—*Age as Affecting Validity of Contract.*—The court will take judicial notice of the fact that men of greater age than sixty-two years so far retain the confidence of the government in their mental capacity as to be placed in judicial positions, and therefore in determining a vendee's mental capacity to enter into the contract the fact that he was of the age of sixty-two is of no moment.

7. INSANITY—*Presumptions and Burden of Proof—Case at Bar.*— Every one is presumed to be sane until the contrary is made to appear by him who alleges it, and in the instant case, a suit for specific performance by a vendor against the vendee, it was held that this presumption had not been overcome by the defendant.

8. SPECIFIC PERFORMANCE—*Vendor and Purchaser—Release by Vendee.*—In a suit for specific performance by a vendor against the vendee, the vendee and his son testified to conversations with the vendor in regard to an attempt of the vendee to obtain a release from the contract, but neither of them testified that the vendee agreed to make any release. It also appeared that the vendor wrote the vendee in regard to sowing grass upon the land, which was the subject of the contract, and that the vendee wrote the vendor telling her to go ahead and do as she liked as he "could not take it and she need not depend on me."

*Held:* That the record did not disclose any intention on the part of the vendee to execute a release, and her declarations and conduct did not amount to such.

9. SPECIFIC PERFORMANCE—*Amendments—Supplemental Answer.*—In a suit for specific performance by a vendor against the vendee the land in question was resold at a judicial sale for default of the vendee and was purchased by the vendor at one dollar above the price the vendee had agreed to pay. The vendee had answered fully at the March term of the court, 1917, but when the report of sale was offered for confirmation at the September term, 1917, he asked to be allowed to file an amended and supplemental answer, which he prayed might be treated as a cross-bill. This answer set up nothing but the fact that the vendor had been in possession of the land from October 1, 1916, when possession was to have been delivered, till the date of sale—a period of eleven months and twelve days—and had used, occupied and enjoyed the land as her own, and that for such use and occupation she was indebted to him in the sum of $5,000.00, which he offered to set off and allow against the balance due by him to the vendor.

*Held:* That there was no error in refusing to allow the amended and supplemental answer to be filed.

10. AMENDMENTS—*Allowance—Discretion of Court.*—While courts are liberal in allowing amendments of pleadings, there must be an end of litigation at some time, and the litgation cannot end as long as the pleading continues. Litigants cannot be permitted to unnecessarily protract litigation by presenting their cases by piece meal. After they have had fair and ample opportunity of presenting their cases in the pleadings, whether or not amendments shall be allowed must rest in the discretion of the court in view of the circumstances of the particular case, and regulated by the established and recognized rules of practice in such cases.

11. AMENDMENTS—*Allowance—Discretion of Court.* — The act of March 27, 1914 Acts 1914, p. 641) gives the right of amendment "at every stage of the proceeding." The object of the act, as its title imports, was to eliminate useless technicalities and to prevent vexatious delays. It was passed "in furtherance of justice," and was never intended to apply to a case where the effect of the amendment would be to encourage pleading by piece meal and unnecessary delay in the termination of the litigation. Indeed, it may be well doubted if the statute is anything more than declaratory of the pre-existing law.

12. SPECIFIC PERFORMANCE—*Maxim that he who cames into Equity must do Equity—Allowance for Use of Land.*—The maxim that he who comes into equity must do equity applies with full force to the complainant in a bill for specific performance. When

the vendor of land gets the full purchase-price, principal, interest and costs, he has gotten all that he contracted for, or is entitled to. If he has derived profits from the land to which the vendee is entitled, he must account for them. But this does not mean that he is to be charged rent simply because he remained in possession pending a suit for specific performance. What he is to be charged with is the value of the actual benefit which was or should have been received from the possession of the land, and not estimated rents or profits.

Appeal from a decree of the Circuit Court of Dickenson county. Decree for complainant. Defendant appeals.

*Amended and remanded.*

The opinion states the case.

*Chase & McCoy* and *W. A. Daugherty,* for the appellant.

*A. A. Skeen* and *C. C. Burns,* for the appellee.

BURKS, J., delivered the opinion of the court.

The appellee sued the appellant for the specific performance of a contract for the sale of a tract of land in Russell county, and the circuit court, on the pleadings and proof, granted the relief prayed. The defendant interposed none of the defenses usually relied on in suits of this nature, but relied solely on the ground that, when the contract was entered into, the appellant (the purchaser) was temporarily insane, and that subsequently the appellee released him from the performance of the contract. The defense is not rested upon fraud, misrepresentation, mistake, accident, unfairness, excessive consideration, or any misconduct on the part of the vendor, but rather on the improvidence of the purchaser, his mental condition, and the supposed hardship that would result to him if he were compelled to perform his contract, and upon a release by the vendor of the obli-

gation of the contract. It will be unnecessary, therefore, to enter into any discussion of the general subject of specific performance of the contracts for the sale of land, and this opinion will be confined to the specific defenses made. If the appellant was capable of making the contract, and has not been released from its performance, there is nothing in the doctrine of specific performance that would afford him relief.

[1] The mere fact that a party has made a bad trade or unprofitable bargain will not relieve .him from specific performance. *Whitted* v. *Fuquay,* 127 N. C. 68, 37 S. E. 141. "It would be a travesty upon justice, and the reputed sanctity of contracts would be of little avail if parties could refuse the performance of contracts having some years to run, which were fairly entered into, and believed to be just and equal when made, merely because from contingencies, whose possibility might have been foreseen, they had turned out, in the course of execution to be a losing, instead of a profitable, bargain." *Southern R. Co.* v. *Franklin, etc., R. Co.,* 96 Va. 693, 709, 32 S. E. 485, 490 (44 L. R. A. 297).

The contract sought to be enforced was for the sale of a tract of 400 acres of land in Russell county, and was entered into by the parties in person on January 1, 1916. Respondent says, in his answer, that he was at that time physically ill and being harassed by security debts amounting to several thousand .dollars which were then being reduced to judgment, and that when these obligations had been discharged he would have left only "some fifteen or twenty thousand dollars worth of real estate and no personal property." Further answering, respondent says: "If it should be decreed that your respondent would have to undertake to carry out said attempted agreement aforesaid, it would mean nothing more than a complete sacrifice óf every dollar's worth of property your respondent now owns, and a balance of indebtedness against him for said land amount-

ing to some fifteen or twenty thousand dollars. And your respondent now being sixty-two years old, and in ill health, and with no other means with which to pay the balance of the purchase price of said farm, he charges and avers that it could result in nothing more than the sale of said farm from him for the payment of the balance of the purchase price for said farm, and thereby the whole of your respondent's property would be exhausted and your respondent would be financially ruined."

The appellant was a prosperous farmer, living in Dickenson county, and owned valuable real and personal property. Amongst other property, he owned a farm of over 400 acres, from which he sold the timber just about the time the contract in suit was executed for $9,000, and another tract of what is called coal land, of about 200 acres, for which he said he had been offered $10,000. About a year before the contract in suit was entered into, he went to Russell county and inspected the appellee's farm and was pleased with it, and enquired the price and was informed that appellee asked $45,000 for it. This he regarded as "a little too big a proposition for him." During the ensuing year, the appellee placed her farm for sale in the hands of D. W. Lyttle, a real estate broker, and informed him that appellant had been there to look at the farm, and told him of others who were interested in the place. Some time about December, 1915, Lyttle wrote to the appellant about the farm, and, after some correspondence between them on the subject, Lyttle went to Dickenson county to see the appellant about buying. While there, Lyttle priced him the farm at $36,000, and he agreed to go to Russell in about a week and look the farm over. He accordingly went to Russell and spent the night with Lyttle, and, the next day, they went over the farm together, and inspected it. The day after, or two days thereafter, appellant agreed to take the farm at $35,750. This agreement was made directly between the appellant

and the appellee, in the presence of Lyttle, who prepared a title-bond, which was executed by the appellee and a note for the first deferred payment which was executed by the appellant. According to the terms of sale, one dollar was paid in cash, one-third of the purchase money was to be paid October 1, 1916, when possession was to be given, and one-third of the balance was to be paid October 1, 1917; another third October 15, 1918, and the remaining one-third October 1, 1919—all of the three last-mentioned payments to bear interest from October 1, 1916. Two days after the purchase, to-wit, on January 3, 1916, appellant contracted to purchase of J. B. Bransford his farm, also in Russell county, at the price of $25,000. The latter contract was subsequently annulled by agreement between the parties, upon the payment of $500 by the appellant. At the time of the two purchases aforesaid, the appellant had very little money with him, not sufficient to pay for the revenue stamps on the note given by him to the appellee.

Only three persons were present when the contract in suit was entered into—the appellant, the appellee and Lyttle. The appellee and Lyttle testify that he seemed to be in possession of all his faculties, and that they observed nothing to the contrary. He went from the appellee's house to the house of E. K. Meade and spent the night. Meade testifies that he had known the appellant for four or five years, and that he did not observe anything to indicate that he was not in possession of all his faculties; that he found him "to be the same all the time, as far as I know, since I have had any acquaintance with him;" that he talked about the trade, seemed to be well pleased with it, and offered to let Meade read the contract which he had with him. He also spoke to Meade about looking out for a pair of heavy horses to put on the Alderson farm. Meade further testifies "he was complaining some of being sick at my house that night and

the next morning," but he did not observe that there was anything wrong with his mind.

Opposed to this is the testimony of the appellant, his wife and children, the sheriff of the county, and three physicians. The appellant testifies that he was not in any mental condition to enter into the contract on January 1, 1916; that he had been sick and was sick at that time, and was very much worried over security debts for his sons which were pressing him; that he would be half asleep and you might speak to him, and in a minute he would not know anything about it, and that he never discovered that his mind was wrong until about April 10, when he began to sleep better. It is a little difficult to understand how the witness, when he became sane, could describe his mental operations while insane, but in addition to this, although he did not recover his sanity till about April 10, he states that about a month after the contract was entered into, which would be not later than February 1, he went to see the appellee about his purchase, and when asked by his counsel to give the substance of his conversation with her, he replies: "Well, I told her that I had got wrong and went into something that I could not pay out and they had noticed me up on them security debts, and after I paid that, that I could not pay her, and I told her that I had come all the way there to tell her before she made any move that would damage her, and not to make any trade nor nothing on my account that I could not come up to it, and I come to tell her." We cannot attach any very great importance to testimony of this kind.

The testimony of the wife and children is of the vaguest and most unsatisfactory nature, giving no facts sufficient to support even their unsatisfactory conclusions as to appellant's mental capacity to contract. In addition to this, the sons were obtaining the father's endorsement of their paper during the very time they say his mental condition was not good, and one of them, when asked if he regarded his father

of sane mind on January 1, 1916, replied: "I don't know." The wife and one of the sons were also interested in the proceeds of the sale of the timber on appellant's land which was made by him within less than a week from the date of the contract in suit. None of the physicians who testified had seen the appellant at any time near January 1, 1916, and were not called upon to testify from personal knowledge. All of them were examined as experts. The following is the question propounded to them, and their respective answers thereto:

Q. "Knowing as you do, the real estate and personal property and other effects of the defendant, J. Wiley Davis, which he owned on January 1, 1916, and considering his age, and that he is over sixty and *menas* of support and income and taking into consideration that on January 1, 1916, that he was financially involved as security for the Davis Mercantile Company, and otherwise, to the extent of some seven thousand dollars, all of which was past due, and part of which was being reduced to judgments at that time, would you regard it as the acts of a sane man for Mr. Davis, on January 1, 1916, to purchase a farm in Russell county, Va., at the price of $35,750, on which he only paid the sum of one dollar and obligated himself to pay the balance on the following installments, viz: $11,915.33-1/3 to be paid October 1, 1916; $7,844.66 to be paid October 1, 1917; $7,944.66 to be paid October 1, 1919—all of the de-. ferred payments to bear interest from the 1st day of October, 1916—and on the 3d day of January, 1916, to purchase another farm in Russell county, Va., at the price of $25,000, on which he paid nothing, but obligated himself to pay for same on the following installments, viz: $10,000 to be paid October 1, 1916; $5,000 to be paid October 1, 1917; $5,000 to be paid October 1, 1918; $5,000 to be paid October 1, 1919—all of the said deferred payments to bear interest from October 1, 1916. Would you regard a man in the

financial condition of Mr. Davis, making the two trades and purchases above, as a man whose mind was in a proper condition and a man sane at the time or not? Please explain how you would regard a man entering into the two transactions above mentioned from a point of sanity?"

Dr. Reed: A. "I would regard the transaction referred to in your question the product of a man's brain who did not realize at the time the responsibility of the obligation he was entering into and must have been the act of a man who was mentally defective or irresponsible for his acts in some way."

Dr. Sutherland: A. "I don't know as regards his sanity, but I do know if he bought the farms with the expectation of paying for same that he had an exaggerated idea as to his own worth."

Dr. Phipps: A. "Well, I would say in answer to this . question that J. Wiley Davis could have been sane, of sound mind, and still make these contracts; but, knowing him as I do, it seems that there is something in some way influencing him outside of the ordinary things brought to bear in trading, to make a man make such indebtedness as this would seem to me, so far as his sanity I would not make any statement as to his sanity at the time of this trade."

[2] While no one of them is willing to go so far as to say that the appellant was insane, their testimony is not expert testimony at all, but the mere inexpert opinions of these gentlemen, and should have been excluded, and doubtless would have been, had it been brought to the attention of the trial court and a ruling thereon asked. It is too late now to ask for the exclusion. *Martin* v. *South Salem Land Co.*, 94 Va. 42, 26 S. E. 591, and cases cited. Their opinions, however, are of no aid to the court in arriving at a correct conclusion of the question involved.

The sheriff of the county had known the appellant for many years. He testifies to certain peculiarities of conduct

he had observed in the appellant during the previous two years and since he had become involved in debt and says he had "told some of them he had gone crazy as a bed-bug."

[3, 4]    Testimony of lay witnesses as to the sanity or insanity of a person is admissible in evidence where it appears that the witness has had sufficient opportunity, by observation, to form an opinion worth considering, but the opinion of the witness should be preceded by a statement of his opportunity for observation, and of the facts observed.   The value of such testimony is dependent very largely upon the character of the witness, his opportunities for observation, the facts observed, the interest, bias or prejudice of the witness, his capacity and intelligence in making and relating his observations and other circumstances which affect the weight to be given to oral testimony generally.   Usually such testimony, where general and continuous insanity is not involved, is not esteemed of much value, except so far as the opinion of the witness is justified by the data observed.   1 Greenleaf Ev. (16th ed.), sec. 430, p. 441-f; *Young* v. *Barner,* 27 Gratt. (68 Va.) 96, 103; *Cropp* v. *Cropp,* 88 Va. 753, 14 S. E. 529; *Howard* v. *Howard,* 112 Va. 566, 72 S. E. 133; *Wampler* v. *Harrell,* 112 Va. 635, 72 S. E. 135; *Conn. Mutual Life Ins. Co.* v. *Lathrop,* 111 U. S. 612, 4 Sup. Ct. 533, 28 L. Ed. 536, and cases cited.

[5, 6]    It is conceded that the appellant was sane and entirely competent to contract shortly before January 1, 1916, and members of his family who testified in his behalf did not hesitate to contract with him, within five days of that time, for the timber on one tract of his land at the price of $9,000.   He speaks, both in his pleading and in his testimony, of being "enthralled" with surety debts for his sons to the amount of several thousand dollars, upon some of which judgments had been obtained and executions had issued and his property was about to be sold.   No doubt

the situation did worry him and make him nervous. It may have disturbed his rest at night and brought on the slight sickness to which some of the witnesses refer in their testimony, but this was far from rendering him incapable of entering into contracts. His own witnesses testify that he was better before he started on the trip to Russell. He took this trip of twenty miles alone on horseback, and after spending the night with Lyttle had to go on horseback an additional fifteen or twenty miles to inspect the farm, and on the day of the purchase neither the appellee, nor Lyttle, nor Meade could discover anything to indicate that he was not in full possession of all his faculties. He had just sold his timber for $9,000, he had coal land for which he had been offered $10,000, and other valuable real and personal estate, and there was offered to him, on long time, at $35,-750, a farm which a year previously had been priced to him at $45,000. He closed the bargain and soon thereafter placed the farm in the hands of the same real estate agent at $50,000. In his answer he states that "said land is well worth the price for which the complainant offered the same to your respondent," and, in his testimony, in answer to the question, "Do you think the farm is worth $35,000?" he replied: "Yes, sir; if a man could pay for it, it is worth every cent of it. I told Mrs. Alderson, if I had it, $50,000 would not buy it." It is true that within the next three days he also bought the Bransford farm at $25,000, and this may seem to have been a very unwise thing for him to have done, so unwise as to have led the physicians to have expressed the opinions hereinbefore quoted, but neither alone nor in conjunction with the other evidence in the cause, does it show that the appellant did not have the mental capacity to enter into a contract. He states in his testimony that he expected to use the money from the timber and from his coal land, as far as it would go, in paying for the Alderson land, and to sell the Alderson land at a profit,

and that was the reason he bought the Bransford land. If he had realized his expectations, his purchases could not have been said to have been foolish. Certainly his reasoning on the subject cannot be said to indicate insanity. But whether his purchases were wise or foolish, if he had contractual capacity, is immaterial. If courts were permitted to pass on the wisdom or folly of contracts, or if that were a test of sanity or insanity, the business of the country would soon be involved in inextricable confusion. Allusion has also been made more than once to the fact that the appellant was of the great age of sixty-two years as affecting, in conjunction with other things, the validity of the contract, but the court will take judicial notice of the fact that men of greater age than that so far retain the confidence of the government in their mental capacity as to be placed in judicial positions where they have to pass on the validity of contracts made under identical circumstances with the case in judgment.

[7]     Every one is presumed to be sane until the contrary is made to appear by him who alleges it, and, in the case in judgment, the trial court was of opinion that this presumption had not been overcome by the appellant, and in this opinion we concur.

[8]     The appellant further made defense on the ground that he had been released from the obligation of his contract; but we do not think there is any merit in this defense.     About a month after the contract was entered into, the appellant and his son visited the appellee for the avowed purpose of explaining to the appellee the circumstances under which appellant had entered into the contract, his inability to comply therewith, and of obtaining a release therefrom.     Appellant and his son each testify to conversations with the appellee, but it is a significant fact that neither of them testify that she agreed to make any release.     On the contrary, the son testifies that "she said she didn't care

to take it back." Great reliance, however, is placed upon a subsequent correspondence between the parties, which was not produced, but the substance of which the appellant undertook to prove. Giving full weight to the testimony on this subject, it did not amount to a release. Some time after the above-mentioned interview, according to the testimony, the appellee wrote to the appellant "that there is some land here to sow in grass, and I have got the seed already bought to sow, and if you are not going to take the land I want to know it, so I can sow it, I have got the seed ready," and the appellant replied, telling her " to go ahead and sow the grass and manage the farm to her own satisfaction just like she had been, for I could not take it and she need not depend on me." This was a plain refusal on the part of the appellant to comply with his contract, but is very far from a release by the appellee of its obligation on the appellant. She doubtless foresaw that the land would have to be resold in order to get her money, and she desired to have it in as good condition as possible so as to attract bidders, and, as she had the grass seed on hand, already paid for, deemed it proper to make the enquiry. Whether or not the grass seed were sown we do not know, nor do we deem the enquiry material. The record does not disclose any intention on the part of the appellee to execute a release, and her declarations and conduct hereinbefore recited do not amount to such.

[9-12] When the land was resold at the judicial sale, for the default of the appellant, it was purchased by the appellee at one dollar above the price the appellant had agreed to pay her for it. The balance of upwards of $4,000 now due the appellee is in consequence of accrued interest on the original purchase price, and costs. The appellant had answered fully at the March term, 1917, but when the report of sale was offered for confirmation at the September term, 1917, he asked to be allowed to file an amended

and supplemental answer which he prayed might be treated as a cross-bill. This answer set up nothing but the fact that the appellee had been in possession of the land from October 1, 1916, when possession was to have been delivered, till the date of sale—a period of eleven months and twelve days—and had used, occupied and enjoyed the land as her own, and that for such use and occupation she was indebted to him in the sum of $5,000 which he offered to set-off and allow against the balance due by him to the appellee. The circuit court refused to allow the amended answer to be filed, and this action of the court is assigned as error. While courts are liberal in allowing amendments of pleadings, there must be an end of litigation at some time, and the litigation cannot end as long as the pleading continues. Litigants cannot be permitted to unnecessarily protract litigation by presenting their cases by piecemeal. After they have had fair and ample opportunity of presenting their cases in the pleadings, whether or not amendments shall be allowed must rest in the discretion of the court in view of the circumstances of the particular case and regulated by the established and recognized rule of practice in such cases. *Bowe* v. *Scott,* 113 Va. 499, 75 S. E. 123, and cases cited. The appellant lays much stress on the act of March 27, 1914 (Acts 1914, p. 641), as giving the right of amendment "at every stage of the proceeding." The object of the act, as its title imports, was to eliminate useless technicalities and to prevent vexatious delays. It was passed "in furtherance of justice," and was never intended to apply to a case where the effect of the amendment would be to encourage pleading by piecemeal and unnecessary delay in the termination of the litigation. Indeed, it may be well doubted if the statute is anything more than declaratory of the pre-existing law. We are of opinion that no error was committed in refusing to allow the amended and supplemental answer to be filed. We are further of opinion,

however, that an amended and supplemental answer was
unnecessary to attain the end desired, and that the court
had ample power, under the pleadings as they were, to give
the appllant any relief to which he was entitled under the
maxim that he who comes into equity must do equity. ' This
maxim applies with full force to the complainant in a bill
for specific performance. When the vendor of land gets the
full purchase price, principal, interest and costs, he has got-
ten all that he contracted for, or is entitled to. If he has
derived profits from the land to which the vendee is entitled
he must account for them. But this does not mean that he
is to be charged rent simply because he remained in posses-
sion pending a suit for specific performance. In the case in
judgment, the vendor had contracted to deliver possession
October 1, 1916. She was able, ready and willing to do so,
but the vendee declined to accept. In order to maintain her
bill for specific performance it was necessary for her to con-
tinue in that position, and she had to allege and prove those
facts. The land in equity was the land of the vendee, and
it was sold as his land, and she had no right to lease it.
She might, with propriety, have vacated it, and the vendee
could not have complained. But she remained on it, it may
be to preserve it for the vendee or to protect it as a security
for the purchase money. The vendee was and is of doubt-
ful solvency. She may have remained at great inconven-
ience and loss, or it may have been at pleasure and profit.
The record is silent on this subject. If she in fact derived
a profit from this occupation, which was indeterminate in
its duration, equity demands that she should account to her
vendee for it. All she is entitled to is the complete fulfill-
ment of her contract of sale. When she gets this she is
made whole. What she is to be charged with, however, is
the value of the actual benefit which was or should have
been received, and not estimated rents or profits. As the
decree appealed from does not provide for this, it will have

to be amended and the case be remanded to the circuit court with directions to enquire and ascertain the value of the actual benefit, if any, derived by the appellee, or which should have been derived by her, from the possession of the farm from October 1, 1916, to September 12, 1917, and, if any such value be found, to credit the same on the decree heretofore rendered in favor of the appellee against the appellant. Costs will be awarded to the appellee as the party substantially prevailing.

*Amended and remanded.*