# Richmond

HARRIET VIRGINIA BURTON FORD v. JOHN RALPH FORD.

March 16, 1959.

Record No. 4889.

Present, Eggleston, C. J., and Buchanan, Miller, Whittle, Snead and I'Anson, JJ.

The opinion states the case.

*George E. Allen* and *Charles E. A. Knight,* for the appellant.

*Valentine W. Southall* and *J. Segar Gravatt,* for the appellee.

I'ANSON, J., delivered the opinion of the court.

This suit was instituted by John Ralph Ford, the appellee, upon a bill of complaint filed March 17, 1953, praying for a divorce *a mensa et thoro,* to be later merged into a decree *a vinculo matrimonii,* from Harriet Virginia Burton Ford, the appellant, upon the ground of cruelty, culminating in constructive desertion on or about the

15th day of January, 1953. A plea in abatement to the jurisdiction of the court was overruled, and the appellant then filed an answer and cross-bill, charging the appellee with cruelty and desertion on February 12, 1953, and prayed for a divorce with alimony.

After the taking of considerable testimony, some heard *ore tenus* and the rest by depositions, the matter was submitted to the chancellor who rendered a written opinion and entered a final decree on November 12, 1957, awarding the appellee a divorce *a vinculo matrimonii* upon the ground "that over a year ago the said Harriet Virginia Burton Ford, without lawful excuse, constructively deserted and abandoned the said John Ralph Ford." To this decree we granted an appeal.

The appellant's assignments of error may be summarized as follows: (1) That the evidence did not support the court's finding that the appellant constructively deserted the appellee, and (2) that the court erred in its finding of fact that the appellant was not insane at the time of the alleged constructive desertion.

The principal question involved is: Was the appellant, Harriet Virginia Burton Ford, sane at the time of the alleged constructive wilful desertion?

If she was insane, she could not have been guilty of constructive wilful desertion. If she was sane, the evidence amply supports the finding of the chancellor.

The parties, who will be referred to as Ralph and Virginia, had known each other for a number of years and were married in September 1945 after a long courtship. Both were over thirty years of age at the time.

After their marriage they went to live at "Holly Hill Farm" in Amelia County where Ralph, prior to his marriage, had lived with his father and a younger sister. Ralph and Virginia occupied the upstairs portion of the home. His father had conveyed the farm of 412 acres to Ralph, reserving for himself the timber and a life estate in the property. Under this arrangement the father and son operated the farm as joint partners.

Virginia was received into the family with kindness and affection and was well treated. From the beginning she did not adjust herself to her husband's family. Shortly after the marriage she began to make the most insulting and degrading accusations against her husband, accusing him of having sexual relations with her own mother and his younger sister.

They later moved to a small cottage on the farm which was approximately 150 yards from his father's home.

In order to keep peace Ralph was forced to cut off all social contact with his brother who lived on a nearby farm. She denied him the privilege of visiting his younger sister after her marriage and objected to visits to the home of his father. None of the members of his family was welcome in their home.

In July 1947 Virginia became ill and was operated upon in a Richmond hospital. When she left the hospital she went to the home of her parents in Chesterfield County. In six weeks she was sent back to the hospital because of extreme nervousness. Upon her discharge from the hospital she again went to her parents' home where she remained for approximately a year. Ralph stayed at her parents' home with her, driving back and forth each day to his work on the farm.

In 1948 Ralph remodeled the cottage on his farm and Virginia moved back there with him. It was not long before Virginia again began making insulting remarks to Ralph and calling him vile names. She would often awaken him in the middle of the night by shining a light in his eyes, or turning the radio on loud. She also accused him of having sexual relations with his step-mother, Mrs. Lavinia Ford, and others, all of which he denied. His health was greatly impaired by her harassment of him.

Virginia was resentful of Mrs. Lavinia Ford and as a result a "feud" developed between them. Virginia began carrying a stick and a grass blade around with her for "protection."

In January 1953 there was a fight between the two women and Virginia scratched Mrs. Lavinia Ford's face. The following day Ralph's father had a warrant issued against Virginia for assault and battery and, on advice of the commonwealth's attorney, the warrant was amended to include "supected of being of unsound mind." Virginia was not taken into custody under the warrant. Ralph took her to her parents' home and employed a lawyer to defend her. The warrant was dismissed on the condition that Virginia move and stay away from "Holly Hill Farm" and that she take psychiatric treatment.

During this time Ralph visited Virginia at her parents' home, trying to decide whether it would be possible to live with her again away from "Holly Hill Farm." On January 27, while visiting her,

she became abusive toward him and he decided they could not live together again.

The evidence shows that Ralph at no time used any abusive language toward his wife and never inflicted any physical violence on her. The testimony of her mother, father and other members of her family shows that he was kind, patient and considerate toward her through all of the difficult years of their marriage.

On February 1, and again on February 18, 1953, Virginia wrote to Ralph, admitting her mistreatment of him and asking forgiveness for the many false accusations she had made.

The above statement of facts is without contradiction in the record.

The appellant seeks to avoid the responsibility for her conduct over a period of years on the ground that she was insane. She has never been adjudged insane by a lunacy commission, but she offers in evidence the deposition of Dr. Harry Brick and a written statement of Dr. H. R. Masters, expert psychiatrists. She also relies on the charge in the warrant of January 14 that "she was suspected of being of unsound mind."

On February 10, 1953, Ralph took Virginia to Richmond, at the request of her parents, to see Dr. Harry Brick. Dr. Brick talked with both Ralph and Virginia in order to obtain a case history. He saw her again on February 12 and before examining her administered to her the "truth serum." Based upon the case history and his examination, he testified that she was suffering from a mental illness at that time; that she presented symptoms of a depression and a paranoid state; that her actions during the period from January 1, 1953, through February 12 could not have been wilful or intentional or her part; that during the same period of time she could not have been capable of transacting any except the very simplest business, nor was she capable of deciding between right and wrong with respect to her marital duties and obligations, or of fully understanding and reasoning out what her marital duties and obligations were. At another point in his deposition he stated that her mental illness went back "for at least six months" prior to February 10 and 12, and that for at least that length of time "she was out of her wits and not responsible."

Dr. Howard R. Masters examined the appellant in 1947 while she was suffering the after-effects of a hospital and surgical experience. His statement, which was offered in evidence, reveals that he examined her over a four-week period; that she had "an extensive

personality disorder of the psychoneurotic type;" that she was advised to accept treatment in a psychiatric hospital, which she refused; that the "diagnosis was constitutional inadequacy, gastrointestinal neurosis, and potential schizophrenic individual," and that if she "continued to reject hospitalization * * * it was felt that without treatment the outlook would not be good and she would most probably develop a mental illness should the pressure of daily problems increase."

The amendment to the warrant of January 14, adding "that she was suspected of being of unsound mind," was made at the suggestion of the commonwealth's attorney on information furnished him. He did not know Virginia except by sight and had no knowledge of her mental condition. No testimony was offered in that proceeding as to her mental condition. Under the circumstances the amendment to the warrent could have no probative value.

The appellee presented in evidence the deposition of Dr. James L. Hamner, who has received many honors for his outstanding contributions in the field of medicine. He was Virginia's family physician. He testified that he had received no special training in psychiatry, but over a period of years a certain portion of his practice had been in psychiatry; that he had served on many lunacy commissions; that he had known Virginia's people all his life and had known her all her life; that he began treating her when she was a small child in 1920 and continued to treat her while she was married to Ralph; that while she was attending school he saw her nearly every day; that she had been pampered and spoiled much more than the average child; that she was accustomed to having her own way; that she was above the average in intelligence; that he had never thought at any time she was mentally ill and did not think so now; that she has always known right from wrong; that she has been, and is, responsible for her actions, and that her emotional symptoms emanated from jealousy, not insanity.

Several lay witnesses testified that they had known Virginia intimately over a period of twenty years and in their opinion she had been spoiled and permitted to have her way, but there was nothing mentally wrong with her.

Virginia's parents and an aunt testified that she was nervous and upset preceding and at the time of her separation from her husband, but at no time did they express the thought that she was mentally

ill or incompetent while she and Ralph were living together, or that she did not understand right from wrong.

Although the evidence of Dr. Harry Brick, Dr. James L. Hamner, and the lay witnesses offered by the appellee, relative to the sanity of the appellant was taken by depositions, most of the testimony describing the conduct of the appellant, including the testimony of certain members of her family, was heard *ore tenus*.

The recognized rule of this court is that the decree of the chancellor is presumed to be correct, even though the evidence may be in sharp conflict, and the burden is on him who assails it to show that it is manifestly wrong. The decree will not be reversed if it is reasonably supported by substantial, competent and credible evidence. *Stutzman* v. *Nash & Son*, 189 Va. 438, 443, 53 S. E. 2d 45, 47; *Ashby* v. *Dumouchelle*, 185 Va. 724, 731, 732, 40 S. E. 2d 493, 496; 1 Mich. Jur., Appeal and Error, § 280, p. 712, 713.

Since the appellant relies upon a plea of insanity to avoid the consequences of her conduct, the burden of proof to establish insanity rests on her. She is presumed to be sane until the contrary is made to appear. 10 Mich. Jur., Insane and Other Incompetent Persons, § 51, p. 171; 28 Am. Jur., Insane and Other Incompetent Persons, §§ 121, 122, pp. 751, 752.

In Virginia, as in other jurisdictions, it is for the jury, or the court trying the case without a jury, to determine the weight to be given the testimony of expert witnesses. The weight to be given is dependent upon the ability and character of the witnesses, their opportunities to be informed upon the subject about which they testify, the reasons given in support of their opinions, their possible bias in favor of the side for which they testify, and any other matters which will illuminate their statements. *Opanowich* v. *Commonwealth*, 196 Va. 342, 354, 355, 83 S. E. 2d 432, 439; 7 Mich. Jur., Evidence, § 176, p. 553; 20 Am. Jur., Evidence, § 1206, p. 1056 *et seq.*, and § 1208, p. 1059 *et seq.*; 32 C. J. S., Evidence, § 567, p. 378 *et seq.*

The opinions expressed by Dr. Brick relative to the sanity of the appellant were founded on a limited opportunity for observation and knowledge of her. He saw her only on two occasions. Many of his opinions were theoretical, or based on answers to hypothetical questions. Dr. Masters made his examination of Virginia in November 1947 over a limited period of time, while she was suffering the after-effects of a hospital and surgical experience, and he does not

state that she was incapable of comprehending right from wrong or of understanding her marital obligations.

Dr. Hamner had known the appellant intimately since her childhood. He saw her frequently and had ample opportunity to know and observe her. He was her family physician. The testimony of the family physician relative to the sanity of his patient is entitled to great weight because of his opportunity to make observations and to form opinions. *Forehand* v. *Sawyer*, 147 Va. 105, 122, 136 S. E. 683, 689; *Price's Executor* v. *Barham*, 147 Va. 478, 481, 482, 137 S. E. 511, 512; *Wooddy* v. *Taylor*, 114 Va. 737, 743, 744, 77 S. E. 498, 501.

The testimony of lay witnesses who have intimately known a person whose sanity is in dispute is entitled to be considered and weighed by the court or a jury trying the case. The value of such testimony depends upon the character of the witness, his opportunities to be informed, his interest, bias or prejudices, his capacity and intelligence to form and express an opinion, and other circumstances which affect the weight given to testimony generally. *Fishburne & Wife* v. *Ferguson's Heirs*, 84 Va. 87, 105, 106, 4 S. E. 575, 579; *Davis* v. *Alderson*, 125 Va. 681, 691, 100 S. E. 541, 544.

The opinions expressed by the lay witnesses were based on observations and intimate knowledge of the appellant over a period of years, and indicate that they were intelligently formed.

It is significant that all of the acts relied on by the appellant to establish insanity were committed by her against her husband and members of his family.

There is substantial, competent and credible evidence to support the chancellor's decree that the appellant was not insane, and that she was guilty of constructive desertion of the appellee for more than a year.

In accordance with the prayer of the appellant, the appellee shall pay to the attorneys for the appellant a fee of $250.00 for the preparation of her brief and oral argument in this court.

The chancellor's decree is

*Affirmed.*