# 𝕾taunton

WRIGHT AND HUNT, INC. v. LLOYD E. WRIGHT, ET AL.

September 11, 1964.

Record No. 5753.

Present, Spratley, Buchanan, Whittle, Snead, I'Anson and Carrico, JJ.

*Rothwell J. Lillard (Randolph W. Church, Jr.; McCandlish, Lillard & Marsh,* on brief), for the appellant.

*Lois H. Miller,* for the appellees.

SNEAD, J., delivered the opinion of the court.

Wright and Hunt, Inc., herein called complainant, filed a bill in chancery against Lloyd E. Wright and his wife, E. Louisa Wright,

herein referred to as defendants. The bill alleged that defendants had breached certain covenants of a lease agreement under which the complainant, as assignee of the lessee, William H. Hunt, occupied premises owned and leased by defendants.

The bill prayed (1) that defendants be required to remove an enclosure erected by them around the interior stairway, or, in the alternative, the lease agreement be reformed reducing the rent payable thereunder by $3,500 per annum, or, in the alternative, judgment for $10,000 be awarded complainant to cover the costs for removal of the enclosure and to restore the premises in its original condition; (2) that complainant be awarded a judgment for $50,000 for damages suffered because of the breach of covenants in the lease; (3) that the complainant be awarded $100,000 punitive damages, and (4) that general relief be granted. The chancellor heard the evidence *ore tenus* and viewed the premises during the course of trial. We granted complainant an appeal from the decree which denied all relief sought.

By a lease dated June 9, 1956, Lloyd E. Wright and E. Louisa Wright leased to William H. Hunt the basement and first floor of a store building located at Maple avenue and Mill street in the Town of Vienna. The lease provided that Hunt could assign the lease to complainant, Wright and Hunt, Inc., and this was done immediately after the lease was executed. For about 10 years prior to the execution of this lease the Wrights and Hunt had conducted a retail mercantile business under the partnership name of Wright and Hunt on the demised premises. The Wrights sold their interests in the partnership to Hunt who formed the complainant corporation, Wright and Hunt, Inc., and Hunt was its manager. The defendants owned the leased premises but had no financial interest in this corporation.

At the time the lease was assigned to Wright and Hunt, Inc., it was the only department store in the town. According to Hunt, since that time "There has been new competition opening in the town in various fields."

The demised premises were composed of an old section which was known as the variety store, and a later addition called the department store. While the partnership was conducting the business the entire first floor of the new section and the first floor and basement of the old section of the building were used for the purposes of display and sales. The basement of the new section was utilized for storage. The complainant used the same areas for sales and display as did the

partnership until September, 1959, when it, with defendants' consent, partitioned the first floor of the variety store into two sections, each about 20 feet wide, and sub-leased the section farthest from the department store to Vienna Speedwash, a laundromat. The remaining section of the variety store was referred to as the home goods store and this area had the only stairway in the building connecting the sales areas of the basement and the first floor.

In the spring of 1961 the Wrights were approached by a representative of complainant for permission to sub-lease "the basement, the downstairs store, to Twin Auto Parts", but for reasons not disclosed in the record this transaction was not consummated.

Hunt's lease was for a term of 10 years and provided for an annual rental of $10,500, and in addition thereto 3 per cent of gross sales between $300,000 and $450,000. It specified that the tenant was to "use and occupy said premises for the sale, storage or display of goods, wares and merchandise or service or any other legitimate business and not to use the said premises for an illegal enterprise." The lessors covenanted that the tenant "shall peaceably and quietly have, hold and enjoy the demised premises" during the term of the lease; that as of the first day of the term the tenant would be placed in actual possession of the premises, "all in conformity with law and in a safe, dry, clean and tenantable condition and in good order and repair", and that they would at their expense "maintain and make all necessary repairs to the demised premises * * * and keep the same in good and tenantable condition and repair."

When the lease was executed in 1956 and the complainant commenced its operations, the premises did not conform to the requirements of the Virginia Fire Safety Regulations. Hunt testified that both he and Wright knew this at the time, but Wright denied having such information.

In 1958, the premises were inspected by a representative of the State Fire Marshal and as a consequence a report, dated August 1, 1958, was mailed to Wright and a copy of it was also mailed to Hunt. The report set forth certain violations of the Virginia Fire Hazards Laws or Virginia Fire Safety Regulations and directed that steps be taken to conform. Among the requirements listed therein was the following:

"2. The basement of this building shall be provided with two approved exitways one of which discharges directly to the outside. This may be accomplished by fully enclosing the existing interior stairway from the basement to the first floor and by providing an

approved exit which is remotely located from the existing interior stairway from the first floor to the basement to the outside. * * *."

The report also contained this recommendation:

"Because of the height, construction and occupancy of this building, it is strongly recommended that it be equipped with an approved automatic sprinkler system in order that a reasonable degree of safety to life in case of fire may be assured."

According to James C. Shipley, District Engineer for the State Fire Marshal and the person who signed the report, if a sprinkler system had been installed in the basement and if an approved exit was provided in the basement there would have been no requirement to enclose the interior stairway. He was asked:

"Q. Now, was it your testimony that, even with a sprinkler system, that the interior stairway would have to be enclosed?

"A. I think with a sprinkler system in the basement and another approved exit in lieu of that one, then that stairway would not have to be enclosed."

The complainant took the position that enclosing the interior stairway would render the basement area "useless for retail purposes" and it advised defendants that it would not agree to the enclosure by any method.

Wright testified that he made inquiry and secured several bids for the installation of a sprinkler system in the basement; that he later learned that the town's water main which came to a "dead end" behind the store was only four inches in diameter and would not furnish a sufficient volume of water for the sprinkler system.

In response to questions propounded to him, Shipley testified:

"A. Mr. Wright did make an effort to put in a sprinkler system and when he investigated into the situation, he discovered that the water system or water supply, I think the nearest available main to him in the town of Vienna was substandard for sprinklery work and he would have to lay a water main which would run into thousands of dollars. I think that put the stop on it right then. He was very concerned about it. He called the man and I think he acted in good faith, but I think this water main stopped it right then as far as he was concerned.

"Q. But he did know the available main was substandard?

"A. I believe he would have sprinklered the building, but the water main was such an expense that it would have prohibited it for him.

"Q. The cost of the sprinkler system and the cost of the water main was prohibitive?

"A. That, all added in together, I think was prohibitive."

The evidence shows that the installation of necessary water mains in the town's street and the automatic sprinkler system would have entailed an expenditure of approximately $10,000. Defendants expended $3,047.25 to enclose the stairway.

The defendants invited representatives of complainant to meet with them, representatives from the Fire Marshal's office and the contractor to decide upon a satisfactory design for the enclosure of the interior stairway. Complainant declined the invitation, and soon thereafter the work was commenced. The stairwell was enclosed partially with wired glass instead of wallboard so that customers could view merchandise on display in the basement as they descended the stairs. Fire doors were installed at the top and bottom of the stairs. Each was equipped with a "fusible closure", and with these devices the fire regulations permit the doors to remain open. When the work was completed in October 1961, the complainant discontinued the use of the basement for display purposes and used it "very little" for sales until shortly thereafter it moved the merchandise to the first floor. According to Hunt, Shipley told him that "the basement could not be used." Shipley denied making this statement.

Two non-resident expert witnesses testified in behalf of complainant. Charles H. Tedford, "an expert in the field of retail merchandising", and Kenneth E. Diehl, a "Commercial leasing specialist and a licensed salesman", stated that as a result of the enclosure of the stairway the basement area had no value as a retail merchandising site, and that the effectiveness of sales on the first floor had been reduced. Tedford said the rental value of the demised premises had been diminished by 25 per cent. Diehl estimated a reduction of 23.67 per cent.

The record shows that when complainant acquired the partnership business in 1956, it was a going concern. Complainant had gross sales of $201,040.89 and a profit of $4,471.39 during the first 10 months it operated the business. That was the only year complainant showed a profit. Each year thereafter there was a decline in gross sales and a loss of money. According to Mrs. Wright, an attorney then representing complainant requested a reduction in rent during the second year of operations as "things were not going too well". The request was refused. Counsel stated at the bar of this court that since the trial of this case complainant corporation was placed in

receivership. The building was vacated and operations have ceased.

At the conclusion of all the evidence, the chancellor had this to say:

"It seems to the Court that the complainants are seeking damages allegedly resulting from a condition under which they never attempted to do business. In other words, the complainants, to all intents and purposes, ceased to do business in the downstairs store and now ask the Court to fix their damages. I feel certain their damages, if they be so, could have been lessened had it been maintained in operation for a reasonable time after the erection of the enclosure surrounding the stairway.

\* \* \* \* \* \* \* \* \* \*

"The undisputable evidence was that Mr. Hunt wanted a sprinkler system installed in the basement, as he might well have, but he refused to do business in the downstairs store after the enclosure of the stairway, although he could have continued to do business by use of the exit to the outside, a door which was then and is now in existence.

"If the provision of the lease was that the entire premises were to be used for the operation of a retail store, then it is difficult to reconcile this with the fact that complainants attempted to lease certain of the area in the basement to others, and it is even more difficult to reconcile a claimed loss of valuable basement space with a voluntary leasing of certain ground floor space, and I refer to the lease to the automatic laundry.

"I further feel, from the testimony and the view taken, that Wright and Hunt, like so many independent merchants, is a victim of today's modern methods of merchandising used by chain stores and shopping centers, with which it is difficult, if not impossible, to compete.

"And finally and specifically, whether the defendants' action in providing for fire safety is reasonable, I would answer that in the affirmative. Were the premises rendered untenable by providing for fire safety? I would answer that in the negative. And lastly, is the complainant entitled to any of the relief prayed for, I would answer that in the negative."

In its assignments of error complainant contends that the chancellor erred (1) in ruling that complainant is not entitled to any relief; (2) in refusing to reduce the rent for the remainder of the term of lease, and (3) in refusing to award it damages in a sum equal to the reduction in rental value of the demised premises from the date the stairway was enclosed to the date of trial plus expenses incurred in

moving merchandise and equipment from the basement to the first floor. The issues presented are in the main factual.

Injunctive relief, damages for loss of profits and punitive damages are not involved in this appeal. Since complainant is in receivership and no longer occupying the premises, the questions of removing the enclosure, or, in the alternative, a judgment for the cost of removing same and restoring the premises to its original condition have become moot.

The complainant says in its brief that defendants "covenanted that the tenants should have quiet enjoyment, that the premises were at that time in conformity with law, and that the landlords would make all necessary repairs and keep the premises in good and tenantable condition and repair." It maintains that defendants breached all of these covenants by enclosing the interior stairway, thereby reducing the rental value of the premises by at least 23.67 per cent.

The judgment of the trial court comes to us with a presumption that it is correct, and will not be set aside unless it appears from the evidence that it is plainly wrong or without evidence to support it. *Ice Company* v. *Lee*, 199 Va. 243, 244, 99 S. E. 2d 721. The burden is upon the party who assails the correctness of the decree to show that it is manifestly wrong. *Ford* v. *Ford*, 200 Va. 674, 679, 107 S. E. 2d 397.

The complainant's two expert witnesses did testify that the enclosure of the stairway reduced the rental value of the demised premises by approximately 25 per cent. Even though this testimony was not contradicted, the chancellor, who heard the evidence *ore tenus* and viewed the premises, was not bound to accept it. As has been stated, complainant ceased sales operations in the basement after the enclosure of the stairway. The experts did not have the benefit of sales experience in the basement for a reasonable time after the enclosure in rendering their opinion. What effect the enclosed stairway would have had on sales and rental value is highly speculative.

In *Ford* v. *Ford, supra*, 200 Va. at p. 679, we said:

"In Virginia, as in other jurisdictions, it is for the jury, or the court trying the case without a jury, to determine the weight to be given the testimony of expert witnesses. The weight to be given is dependent upon the ability and character of the witnesses, their opportunities to be informed upon the subject about which they testify, the reasons given in support of their opinions, their possible

bias in favor of the side for which they testify, and any other matters which will illuminate their statements." (Citing authorities.)

In *City of Roanoke* v. *County of Roanoke*, 204 Va. 157, 168, 129 S. E. 2d 711, we said:

"We do not agree that the court was bound by the testimony of either expert witness in response to the hypothetical questions posed by the court. The court had a right to accept this testimony or reject it. It was for the court to decide what weight should be given their expert testimony. * * *." See also 20 Am. Jur., Evidence, § 1208, p. 1059 *et seq.*

The complainant concedes that the chancellor was correct in holding that the evidence was insufficient to prove loss of profits with certainty. Without the testimony of complainant's two expert witnesses there is no evidence that the rental value of the demised premises was reduced by the enclosure. On the record before us we cannot say that the chancellor erred in not accepting or being controlled by the opinion evidence of complainant's expert witnesses with regard to the reduced rental value of the demised premises, in refusing to reduce the rent for the remainder of the term, or in refusing to award it damages in a sum equal to the reduction in rental value from the date the stairway was enclosed to the date of trial.

Finally, complainant contends that the chancellor erred in refusing to award it damages in the sum of $1,500 to cover the costs incidental to moving merchandise and fixtures from the basement to the first floor necessitated by the enclosure. We find this contention to be without merit. In the first place complainant was not required to move its merchandise. Its actions in abandoning the basement were purely voluntary. Moreover, the evidence shows that practically all of the items of expense claimed were for services performed by its regular salaried employees. These alleged damages were not proven with reasonable certainty.

The complainant has not carried the burden of showing that the decree appealed from is plainly wrong and it is

*Affirmed.*