Richmond

## NORTON C. FINES, an Incompetent person, etc.,

v.

## JOHN F. KENDRICK and RICHMOND MEMORIAL HOSPITAL

April 20, 1979.

Record No. 771005.

Present: All the Justices.

*Russell V. Palmore, Jr. (Andrew J. Ellis,Jr.; Barbara T. Jones; Mays, Valentine, Davenport & Moore, on brief), for plaintiff in error.*

*R. Carter Scott, III; James L. Sanderlin (Kimberly T. Henry; Henry H. McVey, III; Browder, Russell, Little, Morris & Butcher; McGuire, Woods & Battle, on briefs), for defendants in error.*

HARMAN, J., delivered the opinion of the Court.

The sole issue for decision in this medical malpractice appeal is whether the trial court erred in sustaining defendants' pleas of the statute of limitations.

This action was instituted on May 6, 1976, for injuries allegedly received in March, 1971. In his motion for judgment Norton C. Fines (plaintiff or Fines), incompetent, who sued by and through Marjorie Ellen Fines, his next friend, alleged he was injured by the negligence of defendant, John F. Kendrick (Kendrick), a neurosurgeon, and Richmond Memorial Hospital (the hospital), in the care and treatment he received while Kendrick's patient in the hospital.

Both defendants filed pleas alleging that the cause of action was barred by the two-year limitation on actions for personal injuries provided by Code § 8-24, since amended and recodified as Code § 8.01-243. In view of plaintiff's position that Code § 8-24 was tolled

by the provisions of Code § 8-30,* the trial court held an evidentiary hearing on the pleas. After this hearing the trial court sustained the defendants' pleas and entered final judgment in their behalf.

The evidence discloses that plaintiff was unconscious when examined by Kendrick early on the morning of March 24 and that his condition of unconsciousness continued until the hearing. The record also shows that the tests and surgery were performed on March 24. Plaintiff admits the testing and surgery were performed correctly, but here, as in the trial court, grounds his claim of negligence on the failure of Kendrick and the hospital to do the testing and to perform the surgery prior to March 24, 1971, to remove a blood clot from plaintiff's brain.

█ Since Code § 8-30 tolled the limitations statute only if the plaintiff was insane at the time his cause of action arose, the issue of the plaintiff's insanity at the time the action accrued became a question of fact to be resolved by the trial court.

█ In deciding this issue certain well-established legal principles apply. First, there is a presumption in favor of the sanity of every man until evidence that he is of unsound mind is introduced; and this presumption applies in all cases, civil as well as criminal. *Wallen* v. *Wallen,* 107 Va. 131, 150, 57 S.E. 596, 598-99 (1907). Second, when one relies on insanity to avoid the consequences of his conduct, the burden of proof to establish insanity rests upon him. He is presumed to be sane until the contrary is made to appear. *Ford* v. *Ford,* 200 Va. 674, 679, 107 S.E.2d 397, 401 (1959).

While the word "insane" is not defined in Code § 8-30, the words "insane person" are defined in Code § 1-13.11, which provides:

> "The words 'insane person' shall be construed to include everyone who is an idiot, lunatic, non compos mentis or deranged."

In order to toll the statute, therefore, the burden was on the plaintiff to establish by a preponderance of the evidence that he was an idiot, lunatic, non compos mentis or deranged at the time

---

*Code § 8-30, in pertinent part, read as follows:

"If any person to whom the right accrues to bring any such personal action...*shall be at the time the same accrues*. . . insane, the same may be brought within the like number of years after his becoming . . . sane, that is allowed to a person having no such impediment to bring the same after the right accrues . . . except that it shall in no case be brought after twenty years from the time when the right accrued" (emphasis supplied).

his cause of action accrued, presumably on March 23, 1971, since plaintiff makes no claim that he was insane prior to that time.

Only two witnesses testified about the plaintiff's condition on March 23. Plaintiff's wife, Marjorie Ellen Fines, testified that she was with her husband throughout the day of the 23rd. She related that shortly after 8:00 A.M. plaintiff, who had been smoking more than he did normally, was unable to exhale cigarette smoke and was unable to eat. Thereafter, she said he appeared to be asleep and he continued in a progressively deeper sleep throughout the remainder of the day and the night that followed. Mrs. Fines then attributed her husband's condition to medication which he was receiving. She related that she observed no bodily movement by plaintiff after around 11:00 A.M. and he did not speak or communicate with her after 8:00 A.M. on the 23rd.

Mrs. Fines testified that Kendrick came to her husband's room on three occasions on the 23rd, once in the morning, again around 1:00 P.M. and a third time at approximately 6:00 P.M. She said that on Kendrick's last visit her husband "didn't know anybody", and that Kendrick told her plaintiff's condition was "critical" and had been critical since plaintiff's admission to the hospital on March 20. She further stated that Kendrick told her he would be unable to operate on plaintiff for two weeks.

Mrs. Fines, in describing her husband's condition after Kendrick's last visit on the 23rd, related:

> "Well, he continued to get worse and he sort of was fighting for his breath and his temperature went up to 103, and then he began to gurgle in his throat and they had to bring the suction machine in and suction him out and he was just sort of fighting to live all that night."

Mrs. Fines further testified that Kendrick, in several conversations with her after her husband's operation, told her that "if he had operated sooner that it would have made a difference."

Kendrick testified that after Fines' admission to the hospital he saw plaintiff at least once each day. Kendrick saw Fines two or three times on the 23rd and on each occasion found him to be "stuporous", that is "drowsy" but not "totally unconscious." Kendrick related that, while it was difficult to arouse his patient, Fines would "arouse and respond to some extent" and "mov[e] all extremities and . . . say a few words." Kendrick prescribed

"Decadron and Thorazine" to be administered to his patient and, while this combination of drugs can cause a patient to be stuporous if given in "too high a dosage", Kendrick had no reason to believe an excessive dosage had been given to Fines.

Kendrick next saw Fines between 6:30 A.M. and 7:30 A.M. on March 24. At that time Fines "had a definite change from stuporous to unconsciousness". Because of Fines' "progressive deterioration" certain tests were done, after which Kendrick performed surgery to remove a blood clot from Fines' mid-brain, which "control[s] the conscious state". Kendrick did not consider Fines' medical condition to be critical until the morning of the 24th. He denied he told Mrs. Fines on the 23rd that he would not be able to operate on Fines for two weeks. The tests performed on the morning of the 24th were ordered by Kendrick after his last visit to Fines on the 23rd.

When asked if an earlier operation might have improved Fines' likelihood of recovery, Kendrick responded:

> "I think that is a fair statement, yes, but there is no way to predict that. In the first place, I wasn't sure what he had and I was in progress of working him up. He apparently went bad that night."

Thus, the trial court was presented with sharply conflicting evidence regarding Fines' condition on the critical date, March 23. Mrs. Fines' testimony, that her husband did not speak after 8:00 A.M. on the 23rd and that she observed no body movement by him after 11:00 A.M., was in sharp conflict with Kendrick's testimony that Fines, while stuporous, would arouse, move his extremities and speak a few words.

█Faced with this conflict, the trial court concluded that Fines, upon whom the burden of proof rested, had failed to establish that he was insane, within the meaning of Code § 8-30, on March 23 so as to toll the statute of limitations. Upon review to this Court, the decision of disputed questions of fact made by the trial court sitting without a jury has the same effect as the verdict of a jury. Hence, the judgment will not be disturbed unless it is plainly wrong or without evidence to support it. *Reiber* v. *Duncan*, 206 Va. 657, 660, 145 S.E.2d 157, 160 (1965).

Since there is credible evidence to support the holding below, the judgment of the trial court will be affirmed.

*Affirmed.*

POFF, J., dissenting.

Applying what I conceive to be the principles and purposes underlying statutes of limitation and statutes which toll those limitations, I dissent.

Unknown at common law, limitations of action fixed by statute are designed to assure fairness to defendants; justice requires that claims be asserted before evidence is lost, memories fade, and witnesses become unavailable. Statutes which toll limitations are designed to assure fairness to plaintiffs; delay should not defeat plaintiffs' rights of action when the delay results from their inability to exercise those rights.

The sole question raised by our writ is whether the facts, taken in the light most favorable to defendants, show that plaintiff was insane at the time the cause of action accrued. This is a question of law rather than fact, and the "plainly wrong or without evidence to support" standard of review, the standard employed where sufficiency of the evidence is challenged, has no application here. What is determinative is the construction put upon the word "insane" as used in the tolling statute.

Citing Code § 1-13.11, the majority hold that a person is insane if he is "an idiot, non compos mentis or deranged at the time his cause of action accrued". I can accept that construction and yet reject the majority's conclusion that plaintiff's condition did not meet that construction. *Non compos mentis* "is a very general term embracing all varieties of mental derangement." *Black's Law Dictionary* 1200 (rev. 4th ed. 1968). Literally it means "not of sound mind". Unlike the word "insane", which has a narrow import in other areas of the law, the phrase "of unsound mind" encompasses all forms of mental infirmity which deprive a person of the ability to manage his affairs, or in the subject context, to understand his legal rights and to institute legal action to vindicate them. I believe the authors of former Code § 8-30 intended the condition activating the toll to include all such forms of infirmity. Manifestly, the General Assembly held that view as it undertook the general revision of Title 8 of the Code. As revised, the tolling statute abandons the word "insane", employs the phrase "of unsound mind", and defines a person of unsound mind as one "mentally incapable of rationally conducting his own affairs".

Code § 8.01-229(A). Bearing in mind the purpose of the tolling mechanism, the revisions constitute only a definitional clarification and reaffirmation of the original legislative intent rather than a substantive change in the old statute. *See* Revisor's Note.

According to plaintiff's wife, on March 23, 1971 plaintiff "had gone deeper to sleep", "couldn't swallow", "couldn't blow his cigarette smoke out", and "didn't know anybody"; testifying at the hearing five years later she said plaintiff "still doesn't know me", "doesn't know day from night", "can't see", and "I have to feed him and I have to bathe him and shave him, and clean his teeth." Entirely aside from this testimony, defendants' own evidence showed that, at the time plaintiff's cause of action accrued, he was "stuporous", although not "totally unconscious", and that while he could "arouse and respond to some extent", he was "still definitely confused." To conclude that the tolling statute was not intended to preserve the rights of such a person is to wink at reality and frustrate the very purpose such statutes are designed to serve.

I would reverse the order sustaining defendants' plea and restore plaintiff's motion for judgment to the docket for a trial on the merits.