### Richmond

MATTHADUS WILLIAM PRICE

V.

COMMONWEALTH OF VIRGINIA

Record No. 831028.

November 30, 1984.

Present: All the Justices.

*Edward James Woodhouse, Jr.; Francis C. Terwilliger (Terwilliger, Woodhouse & Dodge,* on briefs), for appellant.

*William G. Broaddus, Chief Deputy Attorney General (Gerald L. Baliles, Attorney General,* on brief), for appellee.

COMPTON, J., delivered the opinion of the Court.

In this criminal appeal, we examine the insanity defense as established in the Commonwealth and determine whether the defendant must prove the elements of the defense in the conjunctive or disjunctive. Specifically, we must decide whether Virginia has adopted the actual rule of *M'Naghten's Case,* 10 Cl. and F. 200, 8 Eng. Rep. 718 (1843), or some variation of that principle.

Indicted for murder and use of a firearm while committing murder, Matthadus William Price pled not guilty to both charges and asserted that he was insane when the offenses were committed. Tried by a jury, the defendant was found guilty of first degree murder and of the firearm charge. The trial court imposed the

sentences recommended by the jury of confinement for 20 years for murder and one year for the other offense. We awarded defendant an appeal from the February 1983 judgment of conviction and limited the appeal to consideration of whether the jury was properly instructed on the insanity defense.

On September 12, 1981, the police went to defendant's home in the Town of Pulaski about 9:30 p.m. Upon arrival, the officers found defendant, who was age 57 and employed as a custodian by Appalachian Power Company, nude and "very hysterical and crying." The police saw the body of Richard M. Peoples on the floor with three bullet wounds. The body was cold and "semihard," indicating that Peoples had been dead for several hours.

At the scene, defendant stated that he had shot the victim, that "he didn't mean to do it," that Peoples was defendant's "baby," and that defendant "loved" the victim. Later, at a local hospital, defendant said that he was a "murderer" and that he would "hang for it."

The evidence showed that defendant, who was an epileptic and an alcoholic, spent the night before the killing, and part of the next day, alone in his home with Peoples. The two consumed a quantity of liquor. Defendant took drugs prescribed at a Veterans Hospital for his conditions. Defendant testified that at some point while the two individuals were in the home, defendant fell asleep and was awakened by a "strange, weird noise." According to defendant, the noise was loud and scared him. He left the bedroom, searching for Peoples. He then saw "something like a vision of some kind [of] a hooded person." He said that "things went blank, dark completely" and that he remembered nothing else until he awoke in the hospital three or four days later. Upon admission to the hospital, defendant's blood alcohol level measured .385 percent.

The prosecutor's theory was that defendant, while sane and sober, killed the victim during an argument and that defendant consumed a substantial quantity of liquor after the homicide and before the police arrived at the scene. The defense theory was that defendant suffered from a mental defect which, combined with the consumption of large quantities of liquor, rendered defendant insane at the time of the killing. The defendant presented medical evidence that he was unable to distinguish between right and wrong at the time of the crimes. He also presented evidence that he did not understand the nature and consequences of his act at

the time. The Commonwealth presented extensive psychiatric evidence in rebuttal.

There was no dispute at trial over whether defendant was entitled to an instruction on insanity. Rather, the disagreement centered on which instruction correctly defined the insanity defense. Over the defendant's objection, the trial court gave the following instruction:

"INSTRUCTION 17

"If you find from the greater weight of the evidence that at the time of the offense the defendant was insane, then you must find him not guilty by reason of insanity even though you find that he committed the offense.

"The defendant was insane if he did not understand the nature, character and consequences of his act, and he was unable to distinguish right from wrong."

The trial court refused Instruction 17-B, offered by defendant. It was identical to Instruction 17, except for one word in the second paragraph which provided:

"The defendant was insane if he did not understand the nature, character and consequences of his act, *or* he was unable to distinguish right from wrong." (Emphasis added.)*

Thus, the sole question on appeal is whether the trial court erred in giving Instruction 17 and refusing Instruction 17-B.

The defendant contends that under the trial court's erroneous instruction, in order to prove insanity the defendant must prove both that he did not know the difference between right and wrong, *and* that he did not understand the nature and consequences of his acts. Under the defendant's proffered instruction, the argument continues, insanity is proved if the defendant shows either that he did not know the difference between right and wrong, *or* that he did not understand the nature and consequences of his acts. Defendant asserts that in Virginia the right-wrong test is stated as an alternative to the nature-of-the-act test under a proper definition of the insanity defense.

---

* Proffered Instruction 17-B possesses the same language as present Model Instruction No. 2 (Supp. 4, 1983), *II Model Jury Instructions in Virginia - Criminal* at 319.

Defendant says that under the "first Virginia case involving insanity," *Dejarnette* v. *Commonwealth*, 75 Va. 867 (1881), and under "more recent Virginia cases" dealing with the substance of the insanity defense, *see Thompson* v. *Commonwealth*, 193 Va. 704, 70 S.E.2d 284 (1952), the Court discussed the principle from the perspective of instructions offered by the Commonwealth that the defendant was *sane.* He argues that the instructions approved in those cases do not define what must be proved in order to establish that the defendant is *insane.* In essence, defendant argues that, under *Dejarnette* and *Thompson*, if the defendant knows right from wrong *and* the nature and consequences of his act, then he is sane. Nonetheless, he says, when the logic of those cases is reversed, so as to define the minimum proof necessary to establish the defense of insanity, a defendant is insane if he establishes *either* that he did not know the difference between right and wrong *or* that he did not understand the nature and quality of his acts.

The defendant contends that the definition in the disjunctive is the same as adopted in *M'Naghten's Case.* He says that the 1843 *M'Naghten* Rule was recognized at the time of the 1881 *Dejarnette* decision, and is still recognized, as the majority rule governing the insanity defense in the United States. He says that while *Dejarnette* did not explicitly cite and approve the *M'Naghten* definition, *Thompson* equated the *Dejarnette* Rule with the "English" standard. In *Thompson*, the Court said that the Virginia definition of insanity is known as the " 'right and wrong test,' and is the only one approved in England, Canada and at least twenty-five States." 193 Va. at 716, 70 S.E.2d at 291.

The Attorney General contends that the instruction given by the trial court was in accord with established Virginia law. He argues that there is "no basis" in Virginia decisions for holding that an insanity instruction must be phrased in the disjunctive. He says that if we agree with the defendant, the Court will decide for the first time "that a person is insane merely because he either does not know the nature and consequences of his acts or, alternatively, does not know the difference between right and wrong."

The Attorney General argues that when defendant urges the disjunctive definition, he implicitly is saying that one mind can simultaneously be normal and abnormal, sane and insane. He contends that the law of Virginia does not require such a compartmentalizing of one's intellect. Accordingly, the Attorney General

urges, a defendant should not be permitted to prove only half the test for insanity.

Referring to *Dejarnette* and *Thompson*, the Attorney General argues that the instruction for proof of insanity should be phrased in the conjunctive because of the warning in *Dejarnette* that "[i]nsanity is easily feigned and hard to be disproved, and public safety requires that it should not be established by less than satisfactory evidence." 75 Va. at 881. Correctly noting that *M'Naghten* has never been cited in any of our cases on insanity, the Attorney General contends that this Court has not specifically adopted the *M'Naghten* Rule. We disagree.

In the case of *Boswell v. The Commonwealth*, 61 Va. (20 Gratt.) 860 (1871), ten years before *Dejarnette* and twenty-eight years after *M'Naghten*, Virginia adopted the *M'Naghten* disjunctive rule for proof of insanity. A word-for-word comparison of the holding in *M'Naghten* with the instruction approved in *Boswell* demonstrates conclusively that *M'Naghten* was followed explicitly in *Boswell*. *See* R. Groot, *Criminal Offenses and Defenses in Virginia* at 140 (1984).

The opinion of Lord Chief Justice Tindal in *M'Naghten* states:

"[W]e have to submit our opinion to be, that the jurors ought to be told in all cases that every man is to be presumed to be sane, and to possess a sufficient degree of reason to be responsible for his crimes, until the contrary be proved to their satisfaction; and that to establish a defence on the ground of insanity, it must be clearly proved that, at the time of the committing of the act, the party accused was labouring under such a defect of reason, from disease of the mind, as not to know the nature and quality of the act he was doing; or, if he did know it, that he did not know he was doing what was wrong." 10 Cl. and F. at 210, 8 Eng. Rep. at 722-23.

In *Boswell*, the defendant, while intoxicated, killed a child using a brick. The following instruction was granted by the trial court:

"That every man is presumed to be sane, and to possess a sufficient degree of reason to be responsible for his crimes, until the contrary is proved to their satisfaction; that if, from the evidence, the jury believe that, at the time of throwing the brick, the blow from which caused the death of the de-

ceased, the prisoner was laboring under such a defect of reason from disease of the mind (remotely produced by previous habits of gross intemperance), as not to know the nature and possible consequences of his act, or if he did know, then that he did not know he was doing what was wrong, they will find the prisoner not guilty." 61 Va. at 868.

Without citing *M'Naghten*, this Court expressly approved the instruction. 61 Va. at 874.

The relevant Virginia cases after *Boswell* are entirely consistent with *Boswell* and *M'Naghten*. In *Dejarnette*, the following portion of the trial court's charge to the jury was held to correctly state the law.

" 'But in every case, although the accused may be laboring under partial insanity, if he still understands the nature and character of his act and its consequences, and has a knowledge that it is wrong and criminal, and a mental power sufficient to apply that knowledge to his own case, and to know that if he does the act he will do wrong and receive punishment, and possesses withal a will sufficient to restrain the impulse that may arise from a diseased mind, such partial insanity is not sufficient to exempt him from responsibility to the law for his crimes.' " 75 Va. at 878.

Obviously, that portion of the charge, in the conjunctive, dealt with the defendant's sanity, and not his insanity. *See also Jones v. Commonwealth*, 202 Va. 236, 240, 117 S.E.2d 67, 70-71 (1960).

Likewise, in *Thompson*, the following instruction was approved by the Court (except for one defect not relevant here):

" 'The court instructs the jury that the only degree of insanity which the law recognizes as an excuse for crime is that condition of the mind where the accused is unable to distinguish right from wrong and understand the nature and character and consequence of his act, and in this connection the court further instructs the jury that although you may believe from the evidence that on the 16th day of February, 1951, when it is alleged that the defendant, Eugene Thompson, killed and murdered Clarence Sarver, the defendant, Eugene Thompson, was afflicted in some degree with diabetes; that he was at the time of the alleged killing suffering in

some degree from the effects of insulin, yet if you further believe from all of the evidence that at the time of the alleged killing the defendant, Eugene Thompson, had sufficient power of mind to enable him to distinguish between right and wrong and understand the nature and character of his acts and the consequence thereof, then the court instructs the jury that he was sane and you shall so find.'" 193 Va. at 716, 70 S.E.2d at 291.

The Attorney General relies heavily on that portion of the first clause of the instruction stating that insanity is that "condition of the mind where the accused is unable to distinguish right from wrong and understand the nature and character and consequence of his act . . . ." (Emphasis added.) *Id.* He argues that this Court, in *Thompson,* did not "object" to the portion quoted above which states the test for insanity in the conjunctive, and, thus, he contends, the Court adopted such a test. We do not agree. Manifestly, the instruction as a whole related to defendant's sanity, and not insanity. Indeed, the instruction concluded, "then the court instructs the jury that he was sane . . . ." *Id.*

Consequently, we hold that the actual *M'Naghten* test for insanity, stated in the disjunctive, is the rule in Virginia. Because this principle has been established in the Commonwealth since 1871, we are not disposed to opt now for a conjunctive test, as urged by the Attorney General, even though the *M'Naghten* Rule has been the subject of much debate and criticism over the years. *See* annot., "Modern Status of Test of Criminal Responsibility — State Cases," 9 A.L.R. 4th 526 (1981). See *Davis* v. *Commonwealth,* 214 Va. 681, 682, 204 S.E.2d 272, 273 (1974), for a discussion of the irresistible impulse branch of the insanity defense.

In addition, we are not disturbed that, as the Attorney General warns, a disjunctive test may result in a finding that one mind can simultaneously be normal and abnormal. Indeed, the two elements of the *M'Naghten* Rule logically can be separated.

"The first portion of M'Naghten relates to an accused who is psychotic to an extreme degree. It assumes an accused who, because of mental disease, did not know the nature and quality of his act; he simply did not know what he was doing. For example, in crushing the skull of a human being with an iron bar, he believed that he was smashing a glass jar. The

latter portion of M'Naghten relates to an accused who knew the nature and quality of his act. He knew what he was doing; he knew that he was crushing the skull of a human being with an iron bar. However, because of mental disease, he did not know that what he was doing was wrong. He believed, for example, that he was carrying out a command from God." 2 C. Torcia, *Wharton's Criminal Law* § 100, at 9 (14th ed. 1979) (footnotes omitted).

Finally, we have considered the other arguments raised by the Attorney General, dealing with harmless error and insufficiency of the defendant's evidence to support an insanity instruction in the disjunctive, and find them to be without merit.

It necessarily follows, therefore, that the trial court committed reversible error in misdirecting the jury; Instruction 17 should have been refused and Instruction 17-B given. Consequently, the judgment of conviction for both offenses will be reversed, and the case remanded for a new trial of the charges if the Commonwealth be so advised.

*Reversed and remanded.*