Present:  All the Justices

WILLIAM WHITE, JR.

v.  Record No. 051737    OPINION BY JUSTICE DONALD W. LEMONS
                                   November 3, 2006
COMMONWEALTH OF VIRGINIA

FROM THE COURT OF APPEALS OF VIRGINIA

In this appeal, we consider whether the defendant was improperly denied the opportunity to present evidence to a jury supporting his insanity defense.

I.  Facts and Proceedings Below

William White, Jr. ("White") intended to present evidence of his insanity at his jury trial on charges of first degree murder, a violation of Code § 18.2-32, and assault and battery of a police officer, a violation of Code § 18.2-57.  However, the trial court granted the Commonwealth's motion in limine to preclude White from presenting such evidence.  Consequently, White entered a conditional plea of nolo contendere reserving the right to appeal the trial court's ruling on the motion in limine.

On March 29, 2002, White was traveling in North Carolina when his car broke down on an interstate highway, and he made arrangements for a person he did not know, Elton Giliken ("Giliken"), to drive him to New York.  At approximately 10:00 p.m. while traveling through Greensville County, Virginia, White directed Giliken to take him to a residence.  White went

to the front door at the house and inquired about someone named "Q." White returned to the car and then requested that Giliken take him to a specific motel near Route 301. At the motel, White went to a room and asked the occupants for "Q." He came back to Giliken's car, and then returned to the same motel room where he conducted a conversation through the door with the occupant. At this point, Giliken was concerned about White's actions and attempted to dial 911 on his cell phone, but was unable to get service. White returned to the car and asked Giliken to drive to the back of the motel where there were other rooms. White ingested what appeared to be cocaine, pulled out a knife, tied a bandana around his head, and asked Giliken to wait for him. Then he said, "I'm going to go kill me two mother f**kers" and exited the car. Giliken sped away and notified the police about White's behavior and provided a description of him.

Minutes later, motel guests staying next door to the victim's room heard banging sounds and saw a man run by outside their window. Upon entering the room, the motel guests discovered the victim's body, which was later found to have had 27 stab wounds. Police investigating the murder determined that White was a primary suspect and a warrant was issued for his arrest.

The following day, State Police Trooper K.W. Spencer noticed a man walking on Interstate Highway 95 who was dressed in a "white fur coat, no shirt, red tights, and yellow shorts." The trooper stopped to speak with the man, who was subsequently identified as White, and informed him that he "could not walk on [I-]95." White was reluctant to leave the interstate and argued that his family was looking for him and "wouldn't be able to see him" if he left the interstate highway. The trooper left but returned a few minutes later. On this occasion, he spotted White walking backwards on an exit ramp headed toward the interstate. White approached the trooper's car and expressed frustration at Trooper Spencer for checking on him again. Trooper Spencer called for backup. After a physical altercation, Trooper Spencer and another officer subdued White. At that time, they discovered that a warrant for murder had been issued for White.

Prior to his trial, White followed the procedural steps required by statute to raise an insanity defense. He requested a psychiatric evaluation to determine his mental state at the time of the alleged offense and his competency to stand trial. He gave timely notice to the Commonwealth of his intent to present evidence of insanity pursuant to Code § 19.2-168. The trial court appointed Dr. William D. Brock, a

licensed clinical psychologist, to conduct the psychiatric examination and provide a report.

The Commonwealth sought to preclude White from presenting any evidence regarding his state of mind at the time of the offense.  In its motion in limine, the Commonwealth asserted that Dr. Brock's report did not support an insanity defense, that expert testimony is a "necessary predicate to asserting an insanity defense," and that the defendant cannot "rise above his own evidence" citing to Massie v. Firmstone, 134 Va. 450, 114 S.E. 652 (1922).[1]  Opposing the Commonwealth's motion, defense counsel argued that Dr. Brock's report could be "helpful" in establishing the existence of a mental disease or defect, and proffered additional testimony from lay witnesses to support White's defense on this issue.

The trial court granted the Commonwealth's motion stating that "the introduction of the proffered testimony would not rise to the level of that which would warrant admissibility on the issue of insanity."  As a result, the trial court barred the admission of any evidence to support White's insanity defense.  After this ruling, White changed his plea to nolo contendere reserving his right to appeal the trial court's ruling.  White was then convicted and sentenced to life in

---

[1] The application, if any, of Massie v. Firmstone to this case is not an issue presented on appeal.

prison for the first degree murder charge, and five years for the assault and battery of a police officer.

A panel of the Court of Appeals reversed White's conviction, White v. Commonwealth, 44 Va. App. 429, 605 S.E.2d 337 (2004), but upon rehearing en banc, White's conviction was affirmed, White v. Commonwealth, 46 Va. App. 123, 616 S.E.2d 49 (2005). White appealed to this Court upon one assignment of error: that the Court of Appeals erred in affirming the trial court's ruling which precluded the introduction of any evidence of the defendant's mental state at the time of the offense.

## II. Analysis

### A. Proffered evidence

The defendant proffered evidence in support of his intended plea of insanity that included the original report submitted by Dr. Brock as well as lay witness testimony. Dr. Brock's report noted that White's medical history reflected two hospitalizations for psychiatric treatment, the first occurring in Louisiana several months before the alleged offense, and the second shortly after his arrest. Each time White was treated with Haldol, an anti-psychotic medication. Prior to this report, Dr. Brock did not review hospital records from the Louisiana inpatient treatment because they were unavailable, but he opined that during that

5

hospitalization White was likely treated for a "drug-induced psychosis" caused by "rather heavy abuse" of narcotics. White reported to Dr. Brock that he used cocaine "multiple times daily" for at least three months preceding his arrest on these charges.

White reported to Brock that he was traveling to New York because "'God' had something for him to do there;" he believed that God's purpose would be revealed during the trip; he heard the voices of "both God and the Devil" during much of his journey; he was drawn to a particular motel room because of the number "15" on the door because "he believed the number 14 to be a holy number and the number 15 to then mean '14 and me;'" the number "15" on the door caused him to believe that "he was to go to that room and, apparently, do battle with the individuals in it."

With regard to White's mental state at the time of the offenses, Dr. Brock opined that "[b]y all indications, Mr. White was, indeed, experiencing symptoms of a psychosis at the time of the offenses for which he currently stands charged." The report cites numerous factors supporting Dr. Brock's opinion, including (1) White's history of psychiatric treatment for psychosis, (2) White's decision to return to drug abuse and quit taking his anti-psychotic medication after the Louisiana hospitalization, (3) White's account of the

6

events surrounding the offense, and (4) his "bizarre behavior" in walking backwards down the interstate after being warned by police to stay away from that area.

Dr. Brock opined that while White "seems to meet the threshold criteria for an insanity defense," his defense may not be "viable" for two reasons. First, White's psychotic symptoms "appear to have either been the result of, or have been exacerbated by (most likely the former), his voluntary and excessive use of cocaine." Second, White "made significant efforts to not be identified or get caught" which would indicate that he knew right from wrong.

Dr. Brock submitted a second letter to the court after he had an opportunity to review the records from White's first hospitalization. In this letter, he stated that the medical records "confirm[ed]" his prior hypothesis that White "was suffering from a drug-induced psychosis" at the time of his hospitalization in Louisiana, resulting from "his abuse of cocaine, antihistamines and marijuana." Dr. Brock concluded that White's psychotic symptoms were "almost surely the result of his substance abuse and not some other mental condition."

Additionally, White proffered the testimony of Joseph W. Skinner ("Skinner"), a licensed clinical social worker, who had treated White weekly for a period of about six months during his pre-trial incarceration. Skinner was not qualified

7

as an expert pursuant to Code § 19.2-169.5; however, he was offered as a lay witness. Skinner would have testified that White told him on "many occasions" that he heard the voice of God "both before and after the incident and at times when he was not taking drugs."

White next proffered the testimony of his roommate, Troy Whidbee, who would have testified that "at some time . . . prior to coming to Virginia, that [White] had advised him that someone was out to kill him" and "God needed soldiers." Next, White's mother would have testified that her son was hearing voices prior to coming to Virginia, that he reported having "seen God in the woods," and "that God and the Devil were talking to him trying to get him to do things regarding hurting himself and/or others. That he believed God and the Devil were fighting over his soul." She would have testified that White had drawn red circles around "spiders" in his jail cell, which he alleged were brought there by jail personnel in order to kill him, and that the spiders could not cross the line because "the red symbolized the blood of Christ." Finally, White proffered the testimony of two correctional officers who would have testified that White had expressed to them on several occasions after his arrest that he was hearing voices.

## B.  Insanity Defense

Virginia has long recognized the common law defense of insanity.  See Boswell v. Commonwealth, 61 Va. (20 Gratt.) 860, 876 (1871).  A criminal defendant is presumed to have been sane at the time of the commission of a criminal act.  E.g., Stamper v. Commonwealth, 228 Va. 707, 717, 324 S.E.2d 682, 688 (1985).  However, under the M'Naghten test for insanity, recognized in Virginia, the defendant may prove that at the time of the commission of the act, he was suffering from a mental disease or defect such that he did not know the nature and quality of the act he was doing, or, if he did know it, he did not know what he was doing was wrong.  E.g., Commonwealth v. Chatman, 260 Va. 562, 567, 538 S.E.2d 304, 306 (2000); Price v. Commonwealth, 228 Va. 452, 457, 323 S.E.2d 106, 108-09 (1984); Boswell, 61 Va. at 868.  We have previously stated:

> The first portion of M'Naghten relates to an accused who is psychotic to an extreme degree. It assumes an accused who, because of mental disease, did not know the nature and quality of his act; he simply did not know what he was doing. For example, in crushing the skull of a human being with an iron bar, he believed that he was smashing a glass jar. The latter portion of M'Naghten relates to an accused who knew the nature and quality of his act. He knew what he was doing; he knew that he was crushing the skull of a human being with an iron bar. However, because of mental disease, he did not know that what he was doing was wrong. He believed, for example, that he was carrying out a command from God.

9

Price at 459-60, 323 S.E.2d at 110 (citing 2 C. Torcia, Wharton's Criminal Law § 100, at 9 (14th ed. 1979)).  In any case, when insanity is claimed as a defense, a mental disease or defect must be the cause of the defendant's failure to "know what he was doing" or to understand that "what he was doing was wrong."

In this case, White maintains that he proffered sufficient evidence to make a prima facie case of insanity and that it was error for the trial court to refuse to allow this evidence to be admitted for the jury's consideration.  Prima facie evidence is "[e]vidence that will establish a fact or sustain a judgment unless contradictory evidence is produced."  Black's Law Dictionary 598 (8th ed. 2004).  We need only examine White's proffer of evidence supporting the existence of a mental disease or defect to resolve this appeal.

### C.  Intoxication and "Settled Insanity"

Clearly, we have permitted the use of the insanity defense when prolonged, habitual, and chronic alcohol or drug abuse has created a mental disease or defect.  We adopted the common law distinction between temporary intoxication and permanent insanity long ago.  "Drunkenness is no excuse for crime." Boswell, 61 Va. (20 Gratt.) at 872.  However, a mental disease or defect caused by chronic abuse of alcohol or drugs will support the defense of insanity.  Id. ("[i]f permanent insanity

10

be produced by habitual drunkenness, then, like any other insanity, it excuses an act which would be otherwise criminal"). We have also commonly referred to this permanent condition as "settled insanity." See Arey v. Peyton, 209 Va. 370, 375, 164 S.E.2d 691, 695 (1968). Although he does not use the term, "settled insanity" is what White claims as his condition at the time of the offenses.

The defense of "settled insanity" is not new and it requires that the condition be produced over a significant period of time. See, e.g., People v. Travers, 26 P. 88, 91 (Cal. 1891) ("[S]ettled insanity produced by a long-continued intoxication affects responsibility in the same way as insanity produced by any other cause."); Fisher v. State, 64 Ind. 435, 440 (1878) (recognizing settled insanity defense "where the habit of intoxication, though voluntary, has been long continued, and has produced disease, which has perverted or destroyed the mental faculties of the accused"); State v. Riley, 13 S.W. 1063, 1064 (Mo. 1890) (holding that "long-continued habits of intemperance producing permanent mental disease amounting to insanity" may relieve defendant of criminal responsibility); Cheadle v. State, 149 P. 919, 922 (Okla. Crim. App. 1915) (recognizing settled insanity due to "excessive and long continued indulgence in alcoholic liquors, technically called 'delirium tremens' "); State v. Kidwell, 59

11

S.E. 494, 495 (W.Va. 1907) (recognizing defense of settled insanity "superinduced by habitual and long continued intoxication").  For more recent cases illustrating the same principle, see, e.g., Evans v. State, 645 P.2d 155, 158 (Alaska 1982) (recognizing insanity defense for "alcoholic psychosis such as delirium tremens, resulting from long-continued habits of excessive drinking"); Kiley v. State, 860 So. 2d 509, 511 n.3 (Fla. Dist. Ct. App. 2003) ("[T]he defendant must show that his long term and continued use of intoxicants produced a fixed and settled frenzy or insanity either permanent or intermittent.") (quotation omitted); State v. Clokey, 364 P.2d 159, 164 (Idaho 1961) (upholding instruction defining settled insanity as "produced by long continued intoxication"); State v. Smith, 490 P.2d 1262, 1264 (Or. 1971) (recognizing insanity defense where "excessive and long-continued use of intoxicants produces a mental condition of insanity, permanent or intermittent") (quotations omitted).[2]

White was 28 years old at the time of the offenses.  In his evaluation of White, Dr. Brock stated that White reported

_____

[2] While the Supreme Court of Vermont in State v. Sexton, 904 A.2d 1092 (Vt. 2006), declined to decide if settled insanity was a defense to murder, its opinion provides a thorough history of the defense and the reason for it.  Id. at 1100-04.  The Court found it unnecessary to decide if the defense was available because, even if it were, proof of drug usage for two weeks would be insufficient to establish the defense.  Id. at 1103-05.

12

"a significant substance abuse history.  He reports rather heavy abuse of cocaine, alcohol, and marijuana, as well as occasional use of crack cocaine.  By Mr. White's report, he had been using cocaine multiple times daily for at least the three months prior to his arrest on the current charges."

Dr. Brock also stated that White:

> [H]as a history of one prior psychiatric hospitalization while in Louisiana.  This occurred about three months ago.  The records for this hospitalization were not available at the time of this evaluation.  Mr. White reports that he was treated through use of Haldol, an antipsychotic medication, which would suggest that he was being treated for psychotic symptoms at that time.  The lack of psychiatric symptoms prior to age 27 or 28 and Mr. White's description of rather heavy cocaine abuse at that time would suggest that he likely was experiencing a drug-induced psychosis at the time of that hospitalization.  Mr. White discontinued his Haldol once he got out of the hospital and, by his report, almost immediately began abusing cocaine, marijuana, and alcohol (as well as ecstasy) again.

After reviewing the medical files from White's treatment in a psychiatric hospital while in Louisiana, Dr. Brock informed White's attorney, "Review of these records confirms my hypothesis that, at the time of his hospitalization in Louisiana, Mr. White was suffering from a drug-induced psychosis.  This condition resulted from his abuse of cocaine, antihistamines and marijuana."  Dr. Brock concluded that the "now available medical records simply confirm that Mr. White's

13

psychosis was almost surely the result of his substance abuse and not some other mental condition." Dr. Brock added, "Again, while his drug-induced psychotic state may potentially serve as a mitigating factor, it does not, in my opinion, meet the criteria necessary for an insanity defense."[3]

The requirement of proof of substance abuse of long-term, chronic, and habitual nature is consistent with the concern we expressed many years ago when we stated, "Insanity is easily feigned and hard to be disproved, and public safety requires that it should not be established by less than satisfactory evidence." Wessels v. Commonwealth, 164 Va. 664, 674, 180 S.E. 419, 423 (1935). In order to establish the existence of a mental disease or defect caused by alcohol or drug abuse, i.e., settled insanity, White's evidence would have to demonstrate long-term, chronic, and habitual abuse. White's proffered evidence on this question was insufficient to establish a prima facie defense of insanity.

III. Conclusion

---

[3] Significantly, White's proffered testimony of Dr. Skinner included no discussion of White's drug use, or its duration, and concluded that White "had a type of psychosis that was a religious obsession." Although Dr. Skinner testified at the sentencing hearing, his testimony reflected little on the subject of duration of abuse. Additionally, his testimony was offered at the sentencing hearing and cannot be considered by this Court on appeal because it was not presented to the trial court contemporaneously with its decision which was made upon motion in limine prior to the guilt phase of trial.

We hold that the trial court did not err in excluding White's proffered evidence of insanity.  The judgment of the Court of Appeals will be affirmed.

<u>Affirmed</u>.

JUSTICE KOONTZ, dissenting.

I respectfully dissent.  I do so guided by the axiomatic principle that an accused is entitled to have a jury issue resolved by a jury and not by the trial court or appellate courts, including this Court.  Where, as here, there is evidence to indicate that the accused was legally insane at the time he committed a crime and there is other evidence showing that he was not, that conflict in the evidence presents an issue to be determined by the jury.  <u>Jones v. Commonwealth</u>, 202 Va. 236, 239-40, 117 S.E.2d 67, 70 (1960).  In my view, in the present case in considering the Commonwealth's motion in limine the trial court decided the merits of the insanity defense of William White, Jr. as an issue of law rather than permitting the jury to determine factually whether White was or was not legally insane.[*]

---

[*] White's trial was scheduled to be conducted with a jury. As a result of the trial court's granting the Commonwealth's motion in limine on the morning of the trial, White's sole defense of insanity was eliminated from further consideration in the guilt determination phase of the trial.  Consequently, White's trial proceeded without a jury upon White's conditional plea of nolo contendere and the Commonwealth's uncontested summary of the evidence.

15

While insanity is an affirmative defense in Virginia that the accused must prove to the satisfaction of the fact finder by a preponderance of the evidence, Shifflett v. Commonwealth, 221 Va. 760, 769, 274 S.E.2d 305, 310 (1981), whether the evidence would meet that standard is not at issue in this appeal.  Rather, the sole issue is whether the evidence proffered by White in opposition to the Commonwealth's motion in limine to exclude all evidence of his insanity defense was sufficient merely to establish a prima facie case of insanity.

I will not unnecessarily lengthen this opinion by reciting the proffered evidence pertinent to this inquiry. The majority accurately recites that evidence which is not in dispute.  However, under familiar principles of appellate review, because the Commonwealth was the proponent of the motion in limine, the evidence proffered in support and in opposition to that motion is to be considered in a light favorable to White, the non-moving party.  Cf. Huffman v. Love, 245 Va. 311, 314, 427 S.E.2d 357, 360 (1993) (evidence viewed on appeal in light most favorable to one whose claim was stricken at trial); see also McGowan v. Lewis, 233 Va. 386, 387, 355 S.E.2d 334, 334 (1987) (upon review of the grant of a motion to strike, appellate court will consider the evidence and all reasonable inferences arising therefrom in the light most favorable to the non-moving party, resolving

16

any doubt as to the sufficiency of the evidence in favor of that party); Food Lion v. Melton, 250 Va. 144, 149-51, 458 S.E.2d 580, 584-85 (1995) (same); Waters v. Safeway Stores, Inc., 246 Va. 269, 270, 435 S.E.2d 380, 380 (1993) (same).

The thrust of the Commonwealth's motion in limine was that the only expert who had examined White was Dr. William Brock, who would testify that White was not legally insane at the time White committed the crimes in question because, in Dr. Brock's opinion, White was suffering from a drug induced psychosis but knew the difference between right and wrong. Accordingly, in the absence of any other expert evidence that White suffered from a "disease of the mind," White could not introduce "lay evidence" to support his insanity defense.

We have stated, however, that "[t]here is nothing sacrosanct about the evidence of an expert witness." Wessells v. Commonwealth, 164 Va. 664, 671, 180 S.E.2d 419, 422 (1935). "The evidence of an expert witness [on insanity] should be given the same consideration as is given that of any other witness, considering his opportunity for knowledge of the subject and subject matter as to which he testifies, his appearance, conduct, and demeanor on the stand." McLane v. Commonwealth, 202 Va. 197, 206, 116 S.E.2d 274, 281 (1960). And we also have stated that "[a]lthough sanity or insanity may be established by lay witnesses, it is generally

17

recognized that it is advisable to adduce expert testimony to better resolve such a complex problem." Shifflett, 221 Va. at 769, 274 S.E.2d at 311. (Emphasis added). This is so because a "lay witness" can testify only to facts, and cannot express an opinion as to the existence of a person's mental disease or state of mind. See Jones, 202 Va. at 241, 117 S.E.2d at 71. But see Ford v. Ford, 200 Va. 674, 680, 107 S.E.2d 397, 401 (1959); Davis v. Alderson, 125 Va. 681, 691, 100 S.E. 541, 544 (1919).

Based solely upon Dr. Brock's evidence, a jury would be compelled to conclude that White was psychotic at the time he committed the crimes. In common parlance, White then was suffering from a severe mental disorder associated with a loss of contact with reality. Clearly, because no evidence in the record suggests that White was not psychotic at that time, the jury could reasonably have accepted White's psychotic state of mind as a fact.

Dr. Brock further opined that while White "seems to meet the threshold criteria for an insanity defense," his defense may not be "viable" because of his "efforts not to be identified or get caught" after committing the crimes and because his psychotic symptoms "were the result of his voluntary and excessive use of cocaine." Undoubtedly, White was an admitted abuser of cocaine and other narcotic drugs and

had previously been admitted to a psychiatric hospital as a result. The totality of this evidence would indicate that White, although psychotic, was not legally insane because his abuse of drugs was voluntary and apparently not of long standing.

However, White proffered the evidence of numerous lay witnesses, including his mother, his roommate, a licensed clinical social worker, and prison personnel, that he displayed psychotic symptoms both before and after he committed the crimes when he was not taking drugs. That evidence coupled with the other evidence of these lay witnesses that White believed he heard the voice of God directing his actions created a conflict in the evidence whether White's psychotic state of mind resulted from his drug abuse or some other underlying mental disorder.

In applying the M'Naghten test for insanity we have not required the accused to establish an expert diagnosis of the underlying mental disorder manifested by the accused's psychotic state of mind in order to satisfy the first portion of that test. Undoubtedly mental health experts would be the first to concede that satisfaction of such a requirement would not always be within the current expertise of those in the mental health field. Nevertheless, in Price v. Commonwealth, 228 Va. 452, 459-60, 323 S.E.2d 106, 110 (1984), we explained

the application of the M'Naghten test for insanity that we follow in Virginia and that is facially implicated in this case. There we explained that:

> The first portion of M'Naghten relates to an accused who is psychotic to an extreme degree . . . . The latter portion of M'Naghten relates to an accused who knew the nature and quality of his act. He knew what he was doing . . . . However, because of mental disease, he did not know that what he was doing was wrong. He believed, for example, that he was carrying out a command from God.

Id.

If accepted as fact by the jury, the evidence of the lay witnesses and White's confirmation of that evidence in his account to Dr. Brock that he did not know that committing the crimes in question was wrong because he was carrying out a command from God provides an independent evidentiary basis to support White's insanity defense. That evidence is in sharp conflict with the evidence that White's psychotic state of mind resulted solely from drug abuse as the trial judge, the majority of the Court of Appeals, and the majority of this Court seem to have accepted as a fact. They all may be correct, but such was for the jury to decide because White's proffered evidence was sufficient to establish a prima facie case of his insanity.

20

For these reasons, I would reverse the majority decision of the Court of Appeals, and remand the case for a new trial in which the jury is allowed to decide whether or not White was legally insane at the time he committed the crimes in question.