COURT OF APPEALS OF VIRGINIA


Present:  Judges Humphreys, Haley and Beales
Argued at Alexandria, Virginia


BRANDON MICHAEL CRAWFORD

                                                    MEMORANDUM OPINION[*] BY
v.        Record No. 1293-07-4                      JUDGE JAMES W. HALEY, JR.
                                                        FEBRUARY 3, 2009
COMMONWEALTH OF VIRGINIA


              FROM THE CIRCUIT COURT OF PRINCE WILLIAM COUNTY
                               Lon E. Farris, Judge

              Michael F. Devine (Devine, Connell & Sheldon, on brief), for
              appellant.

              Craig W. Stallard, Assistant Attorney General (Robert F. McDonnell,
              Attorney General, on brief), for appellee


       Brandon Michael Crawford ("Crawford") appeals his convictions for two counts of

capital murder in violation of Code § 18.2-31 (murder in the commission of a robbery and

murder of more than one person in a three-year period) and a single count of burglary with the

intent to commit murder in violation of Code § 18.2-90.  The Commonwealth moved *in limine* to

bar Crawford from presenting an insanity defense.  After a pretrial hearing, the circuit court

granted the Commonwealth's motion.  The sole question presented in this appeal is whether the

trial court erred in granting the Commonwealth's motion *in limine*.  According to Crawford, the

trial court did err because the evidence presented at the hearing on the Commonwealth's motion

was sufficient for a reasonable jury to conclude that, at the time of the killing, Crawford met the

applicable legal standard for an insanity defense.  For the following reasons, we disagree and

affirm.

_____

       * Pursuant to Code § 17.1-413, this opinion is not designated for publication.

FACTS

The evidence is undisputed that, in September of 2001, Crawford entered the apartment of Paul Domaszek in Manassas, Virginia and stabbed him to death. There is no evidence that Crawford and Domaszek knew each other. Police did not suspect Crawford in the killing until July of 2004, when they discovered that a DNA profile generated from samples of blood found at the scene of Domaczek's killing matched the DNA Crawford submitted to the Virginia DNA database. Crawford's DNA was added to the database after his sentencing in June 2004 for a second murder in Virginia Beach. The second murder took place approximately one month after police discovered Paul Domaszek's body in Manassas.

A Prince William County grand jury returned indictments against Crawford on October 3, 2005. The trial court ordered an evaluation of Crawford's sanity at the time of the offense pursuant to Code § 19.2-169.5. William Stejskal, a clinical psychologist, interviewed Crawford for approximately eight hours and thoroughly reviewed Crawford's medical records. Dr. Stejskal submitted a report to defense counsel, dated August 8, 2006. Ten days later, Crawford gave notice, pursuant to Code § 19.2-168, that he intended to put his sanity in issue at trial. On the Commonwealth's motion, the circuit court ordered a second evaluation of Crawford's mental state at the time of the offense. Leigh Hagan, also a clinical psychologist, interviewed Crawford and reviewed his medical records, including the earlier report of Dr. Stejskal. After receiving Dr. Hagan's report, the Commonwealth moved *in limine* to bar Crawford from presenting an insanity defense.

At a pretrial hearing, the defense argued that Crawford could produce evidence sufficient for a reasonable jury to find by a preponderance of the evidence that Crawford met the legal definition of insanity at the time of the offense. In support of Crawford's position, defense

counsel submitted Dr. Stejskal's report, thirty-one other medical records documenting Crawford's mental health history from April 2001 until February 2005, the testimony of Eleanor Heath, a therapist at the Prince William County jail, and the testimony of the defendant's mother. In support of the motion *in limine*, the Commonwealth submitted Dr. Hagan's report. After hearing argument, the trial court granted the Commonwealth's motion *in limine*.

<u>Proffered Evidence of Crawford's Mental State</u>

At the time he killed Paul Domaszek, Crawford lived with his mother and younger brother in Woodbridge, Virginia. His mother worked for an agency that employs nurses and sends them to different assignments in hospitals across the country. Because of Ms. Crawford's work, the family moved frequently. Crawford lived in Florida at the time of his first involuntary hospitalization on April 18, 2001. From Florida, the Crawfords moved to Woodbridge, Virginia in August. They moved again, when Ms. Crawford received a new assignment, this one in the Tidewater area of Virginia, in late October of 2001. While they were staying at the Marjac Suites Hotel in Virginia Beach, on November 13, 2001, Crawford killed Walter Otis. Crawford was arrested the same day and has been incarcerated or hospitalized ever since.

Ms. Crawford testified that her son's behavior and mental health seemed normal until late 2000 and early 2001. Around that time, Crawford stopped interacting with other people, had trouble sleeping, and had conversations with characters on television. She remembers him pacing around the house for long periods of time and cursing, sometimes screaming, at no one in particular. Ms. Crawford also testified that her son thought people were peering through their back windows, watching him. He would occasionally sit in his room with the lights off, mumbling to himself.

The thirty-one medical records document a number of hospitalizations. Each followed what were apparently unprovoked attacks upon strangers or family members, and geographically follows his mother's work changes. In April 2001, he was hospitalized in Florida after threatening a stranger. He was released after treatment with anti-psychotic and mood stabilizing medications. In a Florida hospital, he was diagnosed with schizophreniform disorder[1] and prescribed medication. The medical records indicate that at the time he was discharged on May 2, 2001, he exhibited no signs of psychosis and denied having hallucinations.

In June 2001, Crawford threatened his brother and was hospitalized in Florida. He was released two days later following medication. On July 10, 2001, he threatened his mother and was returned to the hospital. His admission information reflects a diagnosis of bipolar disorder, but states that he denied having hallucinations, and he denied having homicidal or suicidal thoughts. Crawford was hospitalized, again in Florida. Once again, his behavior became calm when he took his prescribed medication, and his psychotic symptoms disappeared during his time in the hospital. He was released again on July 23, 2001. [2]

---

[1] Dr. Stejskal's report indicates that this diagnosis is used when the patient has "all of the hallmark symptoms of schizophrenia, but has not been acutely symptomatic for a full 6 months." Dr. Hagan's report includes a similar description.

[2] Addressing the medical records of the Florida hospitalizations, Dr. Stejskal concluded that

> a psychotic disorder was present . . . but the clinical presentation/course did not neatly coincide with the diagnostic criteria for one of the *specific* major psychotic mental illnesses. This is often the case during the initial emergence of a psychotic disorder (i.e. the *prodromal* phase of the condition) in younger individuals who later exhibit a full schizophrenic, schizoaffective, or Bipolar Disorder.

(emphasis in original). Dr Stejskal explained: "The prodromal period of a major mental illness . . . is that period early in the emergence of the condition when the signs and symptoms begin to

Obtaining new work, his mother moved from Florida to Woodbridge, Virginia. Following a month in foster care in Florida, Crawford rejoined his mother and brother in Woodbridge on August 28, 2001. On September 25, 2001 - after the Domaszek killing but before the police or Crawford's family learned that Crawford was the killer – Crawford was admitted to the Psychiatric Unit of the Naval Hospital in Bethesda, Maryland after attempting to choke his mother. The hospital's progress notes suggested that he had not been taking his medication. He was not discharged until October 17, 2001. While at the hospital, he was diagnosed with bipolar disorder, and, at the time of his discharge he was taking zyprexa (anti-psychotic), depakote (mood stablizer), and paxil (anti-depressant). Crawford moved with his mother to the Tidewater area of Virginia in November of 2001 where he was arrested for killing Walter Otis.

Several medical records and the testimony of Eleanor Heath confirm that Crawford's illness continued during his incarceration. Ms. Heath, a therapist at the Prince William jail, testified that, when Crawford was at the jail, he was hallucinating and mumbling to unseen persons. He also spread feces around his cell, ate food from the toilet, and tried to insert food into his anus. Crawford's behavior became normal again when he resumed taking his medication.

Dr. Stejskal's Report

Crawford spoke to Dr. Stejskal at length about the Domaszek killing. He told Dr. Stejskal that he was angry with his mother after his return from Florida. He told Stejskal that

---

occur, usually in a less intense prominent and persistent form than they will eventually take once the condition has fully effloresced."

he felt "manicky" on the evening he killed Domaszek. He had not slept the night before and felt very energized and agitated. He said that he had an intense urge to hurt or kill someone.

> Mr. Crawford recalls leaving his apartment on the evening of September 10, 2001. He took care to leave in a manner that would not alert his mother, who was home that evening. He was carrying a knife from his kitchen. He remembers that he intended to check other apartments for an open door, but he cannot recall whether he had tried other doors before entering the victim's unlocked sliding-glass back door. He entered the apartment and saw the victim lying facedown, naked and unconscious on the floor in front of the television. Mr. Crawford stated that the victim was drunk and passed out, but when asked how he knew this, he allowed that he was not sure; "maybe the detectives told (him) that." He recalls "having a conversation with him" even though the victim remained unconscious on the floor. Mr. Crawford could not explain this further, included what he might have said to the victim, although, when asked, he did say that the victim did not speak back to him in any manner.

> Mr. Crawford recalls straddling (kneeling or stooping, he is not certain which) over the victim, facing the back of his head. After he began to stab the victim with the knife, the victim became conscious and began to struggle and vocalize. Mr. Crawford states that he continued to attack the victim with the knife until he stopped breathing. When asked what he was thinking or feeling, Mr. Crawford stated that he does not know or remember. When specifically asked if he remembered feeling surprised by anything that happened, he stated, "That he stopped breathing, that he would die. I was just killing him – I didn't think he would die." When asked to explain or clarify this rather incongruous statement, Mr. Crawford could not do so, other than to verbalize additional variants of "I didn't expect for him to die."

After Domaszek was dead, Crawford looked through the drawers and closets in Domaszek's apartment. As he prepared to return to his own apartment, he realized that he was covered with the victim's blood. Afraid that his mother would discover what had happened, he returned to Domaszek's apartment where he washed his clothes. He watched two pornographic movies while his clothes were in the wash. He also told Dr. Stejskal that he kept glancing at

Domaszek's body because he was afraid that "he would come back to life and be a zombie and eat me."

Crawford stated to Dr. Stejskal that, "he would not have killed the victim if someone had been present and watching, as he did not want to be caught." Dr. Stejskal described Crawford as "a chronically mentally ill young man with residual symptoms of a psychotic mental disorder, most likely Schizoaffective Disorder, Manic Type." After describing Crawford's medical history and Crawford's account of the offense, Dr. Stejskal made the following conclusions: "The symptoms of [Crawford's] mental illness . . . impaired the defendant's capacities 1) to appreciate the criminality of his actions and 2) to conform his conduct to the requirements of the law on the night of the offense, and constitute significant factors in mitigation."

That being said, Dr. Stejskal then addressed the M'Naghten standard:

> The offense was clearly the product of his mental illness, in that it would not have occurred had the defendant been in good mental health, or if he had been receiving adequate psychiatric treatment. *It is not at all clear, however, that this defendant's mental disturbance at the time of the offense reaches the high threshold for legal insanity under Virginia case law. The defendant's own recounting of events, while rich with indicators of present and past psychosis, also contain statements that suggest that he had at least a partial appreciation of his actions, along with a capacity to regulate and direct his behavior. While the products of his actions that night strongly suggest an irrational motive, to conclude that such was the case requires a leap of inference that cannot be supported by the information currently available. While another evaluator might reasonably arrive at a different conclusion, I am not able to opine at this time to a reasonable degree of certainty that the defendant, because of his mental illness, on the night of the offense was unable to appreciate the nature, character, consequences or wrongfulness of his actions, or that he was unable to restrain the impulse to act.*

(Emphasis added).

<u>Dr. Hagan's Report</u>

Crawford's statements to Dr. Hagan included an account of the offense that is similar to the one he had already given to Dr. Stejskal. According to Dr. Hagan's report, however, Crawford gave a description of the killing that was somewhat more detailed:

> He left the front door and walked around the apartment complex at around 11:15 p.m. He passed by a ground level apartment after observing the sliding screen door was closed, but the glass door was open. He was looking specifically for an apartment he could enter. He observed a knife on the bar of the kitchen. It was a brown handled knife of about 18 inches. He observed the victim asleep naked on the floor of the living room. "I stood over top of him with a kitchen knife. I knew what I had to do."
>
> He stabbed him in the back of the neck. The victim woke up. The defendant put his hand over his mouth while he sawed on the victim's neck. The victim was screaming. The upstairs neighbors stomped on the floor telling them to be quiet. The victim was kicking, screaming, and dying. The defendant recalled saying, "Die. Die. I was telling him to just die." There was blood. "Right before he died, I had my hand over his mouth and he tried to look back. I was trying my hardest to keep him from looking at me." The victim died. It was over.

As in his account to Dr. Stejskal, Crawford told Dr. Hagan that he remained in the apartment to wash off the blood so that his mother would not know what he had done. He also told Dr. Hagan about his search through Domaszek's belongings. "He saw a credit card, but did not use it because he had seen on television that thieves get caught using their victims' credit cards. . . . He wiped his prints off and then threw [the credit card] out in the back area when he realized that it could be traced." Like Dr. Stejskal, Dr. Hagan reported that Crawford told him he was afraid Domaszek's body might become a zombie and eat him. However, Dr. Hagan also noted that: "[Crawford] specifically denied hearing voices or seeing things that were not there." Crawford also told Dr. Hagan that he would not have killed Domaszek if law enforcement officers, his mother, or any other authority figure had been present.

Dr. Hagan reported that, in his opinion, Crawford understood the nature, character,r and consequences of his actions and also understood that they were wrong. In support of this conclusion, Dr. Hagan noted that there was no indication of command hallucinations or "voice of God" that seemed to compel his behavior. Crawford admitted he would not have done what he did if someone else had been present, and he attempted to avoid detection.

## ANALYSIS

"'In Virginia . . . insanity is an affirmative defense that the defendant must establish to the satisfaction of the fact finder.'" Morgan v. Commonwealth, 50 Va. App. 120, 126, 646 S.E.2d 899, 902 (2007) (quoting Shifflett v. Commonwealth, 272 Va. 619, 629, 636 S.E.2d 353, 358 (2006)). "A criminal defendant is presumed to have been sane at the time of the commission of a criminal act." White v. Commonwealth, 272 Va. 619, 626, 636 S.E.2d 353, 356 (2006). Virginia recognizes both the M'Naghten and the irresistible impulse tests of insanity. Godley v. Commonwealth, 2 Va. App. 249, 251, 343 S.E.2d 368, 370 (1986). Crawford makes no argument that he met the irresistible impulse test.[3] He only argues that he met an applicable legal test. Before the M'Naghten test for insanity is satisfied:

> It must be clearly proven that, at the time of the committing of the act, the party accused was labouring under such a defect of reason, from disease of the mind, as not to know the nature and quality of the act he was doing; or, if he did know it, that he did not know he was doing what was wrong.

Price v. Commonwealth, 228 Va. 452, 457-58, 323 S.E.2d 106, 109 (1984) (quoting M'Naghten's Case, 10 C. & F. 200, 8 Eng. Rep. 718, 722-23 (1843)). The defendant has the burden of

---

[3] In any event, "[e]vidence that an accused planned his or her criminal acts precludes, as a matter of law, any finding that the accused acted under an irresistible impulse." Bennett v. Commonwealth, 29 Va. App. 261, 278, 511 S.E.2d 439, 447 (1999). In this case, all the available evidence suggested that Crawford planned the crime, i.e. getting the knife, looking for an open apartment, etc.

affirmatively raising the defense of insanity and proving that he met the legal standard for insanity by a preponderance of the evidence.  See Taylor v. Commonwealth, 208 Va. 316, 322, 157 S.E.2d 185, 189-90 (1967); Herbin v. Commonwealth, 28 Va. App. 173, 183, 503 S.E.2d 226, 231 (1998).

The trial court may bar a defendant from presenting an insanity defense if the evidence does not establish a prima facie case that the defendant was legally insane at the time of the offense.  White, 272 Va. at 629, 636 S.E.2d at 358; Morgan, 50 Va. App. at 126, 646 S.E.2d at 902.  "Prima facie evidence is '[e]vidence that will establish a fact or sustain a judgment unless contradictory evidence is produced.'"  White, 272 Va. at 626, 636 S.E.2d at 357 (quoting Black's Law Dictionary 598 (8th ed. 2008)).

Crawford argues that the trial court's ruling relied on an erroneous reading of White.  He contends the trial court erred in concluding that expert opinion testimony that Crawford was legally insane was essential to any prima facie case of insanity.  Such opinion evidence is not essential, argues Crawford.  While Crawford concedes that his efforts to conceal his role in the Domaszek killing tended to show that he was not insane, he argues that the abundant evidence that he had a serious mental disease at the time of the offense tends to show that he was.  Crawford maintains that this purported evidentiary conflict requires us to:  1) review the facts on appeal in the light most favorable to him, and 2) to consider only the evidence contained in his proffer of evidence tending to show he was insane.  The mental disease evidence provided in the medical records, together with his statement that he was afraid that Domaszek's body would become a zombie and eat him, Crawford continues, were sufficient for a reasonable jury to conclude that he met the M'Naghten standard for an insanity defense.

- 10 -

We agree with Crawford that expert opinion testimony that the accused was legally insane at the time of the offense is not an essential predicate for the presentation of an insanity defense to a jury. See Lucas v. Commonwealth, 201 Va. 599, 607, 112 S.E.2d 915, 921 (1960) (holding that defendant was entitled to have the insanity issue decided by a jury despite expert witness' failure to offer an opinion that defendant was insane at the time of the offense); see also McCulloch v. Commonwealth, 29 Va. App. 769, 774-75, 514 S.E.2d 797, 800 (1999) (suggesting that, in an appropriate case, factual testimony from laypersons alone may be sufficient to establish an insanity defense); Herbin, 28 Va. App. at 183, 503 S.E.2d at 231 (same).

Instead we must decide this case by applying the M'Naghten standard for insanity to the facts of this case, in light of prior decisions applying that standard. The facts in the record are Crawford's medical records, the testimony of Crawford's two witnesses, and Crawford's statements about the offense recorded in the reports of the two expert witnesses. Conflicting evidence as to whether the defendant was insane at the time of the offense presents a jury question. Jones v. Commonwealth, 202 Va. 236, 239, 117 S.E.2d 67, 70 (1960); Holober v. Commonwealth, 191 Va. 826, 837, 62 S.E.2d 816, 821 (1951). Because of this principle, Crawford is correct that, on appeal, we must view the facts in the record in the light most favorable to him. However, we disagree with Crawford's contention that the procedural posture of this case restricts the scope of our review only to the evidence that tends to show he was insane and only to the evidence that he presented in his proffer. Indeed, here it was the Commonwealth who made the motion *in limine*. As the moving party, the Commonwealth is permitted to offer evidence in support of its motion, i.e. that Crawford has failed to make a prima facie case. Moreover, in Thompson v. Commonwealth, 193 Va. 704, 717-18, 70 S.E.2d 284, 292 (1952), our Supreme Court upheld the trial court's denial of a jury instruction on the irresistible

impulse test of insanity. In reaching this conclusion, the Court clearly considered evidence that the Commonwealth had presented, evidence that tended to show that the defendant's actions were not the result of an irresistible impulse.

> The uncontradicted evidence for the Commonwealth, as heretofore stated, proved an antecedent grudge, threats, plans and preparations for the killing and defendant's statement to the deceased that he brought him to the wooded area for the specific purpose of killing him. The two eyewitnesses to the killing were positive that the defendant was unexcited, calm, deliberate and in full possession of his mental powers. Defendant's only explanation for the Commonwealth's testimony was simply "I don't remember."

> \*   \*   \*   \*   \*   \*   \*

> "Q. If a man were going into an insulin shock and was going to be violent or do a violent act while in that insulin shock, would he make preparations for it?"

> "A: No, I would not think he would."

> In the absence of any evidence tending to prove that defendant was driven by an irresistible impulse to kill Sarver, he is not entitled to an instruction on this phase of insanity.

Id. at 718, 70 S.E.2d at 292.

We see no reason – and Crawford does not provide one – why a reviewing appellate court should ignore evidence in the record tending to negate his argument that the trial court erred in barring him from arguing to a jury that he met the M'Naghten test of insanity when similar evidence was clearly considered by our Supreme Court in its review of a similar substantive argument, in a similar procedural posture, with respect to the irresistible impulse test. Accordingly, we may consider Crawford's efforts to conceal his involvement in the killing because the evidence of Crawford's efforts to avoid detection is not contradicted by any of the other evidence in the record. We may also consider those portions of Dr. Hagan's report that are

- 12 -

not in conflict with any of the evidence in the record more favorable to Crawford's claim that he met the M'Naghten test.[4]

There was abundant evidence that Crawford had a mental disease at the time he killed Domaszek. However, evidence that the defendant had a mental disease is a necessary, but not sufficient, condition for a successful insanity defense under the M'Naghten standard. "In most situations, the clinical diagnosis of a DSM-IV mental disorder is not sufficient to establish the existence for legal purposes of . . . 'mental diseas[e]' or 'mental defect.'" Clark v. Arizona, 548 U.S. 735, 775-76 (2006). "The classification of a mental disease or defect developed by psychiatrists for the purpose of treatment does not control the legal definition used for assessing criminal responsibility." People v. Lowitzki, 674 N.E.2d 859, 863 (Ill. App. Ct. 1996). In addition to proving that he suffered from a mental disease, Crawford was required to prove that he did "not know the nature and quality of the act he was doing; or, if he did know it, that he did not know he was doing what was wrong." Price, 228 Va. at 457-58, 323 S.E.2d at 109 (quoting M'Naghten's Case, 10 C. & F. 200, 8 Eng. Rep. at 722-23).

Testimony from his mother and from Ms. Heath tended to show that he sometimes perceived people or things that were not there, both before, and after, he killed Domaszek. Such actions might be considered hallucinatory. However, Crawford told Dr. Hagan that he was not experiencing hallucinations at the time he killed Domaszek. There is nothing in Crawford's

---

[4] It might also be argued that Dr. Hagan's report should be treated differently because, unlike the Commonwealth's evidence in Thompson, Dr. Hagan's report was not introduced during the defendant's trial, but in support of a pretrial motion. We believe this is a distinction without a difference. Although the disputed ruling in this case was made before trial, the Commonwealth relied on Dr. Hagan's report in its written motion *in limine*, and the trial court was aware of the report at the time of its ruling on that motion. Even Crawford's brief argues that the appropriate standard by which we should review the granting of the Commonwealth's motion on appeal is the same standard we use in reviewing a trial court's denial of a defendant's proffered jury instruction.

medical records, nothing in the testimony of Crawford's witnesses, and nothing in Dr. Stejskal's report to contradict this statement. Crawford's statement to Dr. Hagan that he remembered telling Domaszek, "Die. Die. I was telling him to just die," is also uncontroverted by other evidence, and clearly suggests that he was aware of what he was doing. Crawford also told Dr. Hagan that he would not have killed Domaszek if someone else had been present. Moreover, both psychological evaluators reported that Crawford took deliberate steps to conceal his involvement in the killing.

Crawford does not argue that he made a prima facie showing of legal insanity based upon lay testimony or the medical records alone. Rather, he maintains that, in conjunction with that testimony and those records, Dr. Stejskal's opinion that Crawford's mental illness, "impaired" Crawford's ability to appreciate the criminality of his actions and conform his conduct to the requirements of law, sufficed to present a prima facia insanity defense. However, "impaired ability" is not the standard in Virginia.

To qualify for an insanity defense in Virginia, an accused must show that he is suffering from a mental defect such that he did "*not* know the nature and quality of the act he was doing; or . . . that he did not know he was doing what was wrong." Id. (emphasis added). The accused must show more than an "impaired" ability to understand the nature or wrongfulness of his act. He must prove that he possessed the complete *inability* to understand the nature or wrongfulness of his act. Thus, even in the light most favorable to Crawford, the lay testimony, the medical records, and Dr. Stejskal's " impairment opinion" would not permit a reasonable jury to conclude that Crawford satisfied the M'Naghten standard. That standard for proving insanity "has been established in the Commonwealth since 1871" and continues to be "the rule in Virginia." Price, 228 Va. at 459, 323 S.E.2d at 110. Accordingly, we hold that the trial court did not err in

granting the Commonwealth's motion *in limine* to bar Crawford from presenting an insanity defense.

CONCLUSION

For the aforementioned reasons, we affirm Crawford's convictions.

<u>Affirmed.</u>